**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| BAN ME THUOT HONEYBEE JSC, ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| BAO NGUYEN HONEYBEE CO, LTD, ET AL., ) | |
| ) | |
| Plaintiff-Intervenors, ) | Before: Richard K. Eaton |
| ) | Senior Judge |
| v. ) | |
| ) | Court No.  25-00085 |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| AMERICAN HONEY PRODUCERS ASSOC. ) | |
| ) | |
| Defendant-Intervenor. ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON
THE AGENCY RECORD OF
PLAINTIFFS BAN ME THUOT HONEYBEE JSC, ET AL.
AND PLAINTIFF-INTERVENORS
BAO NGUYEN HONEYBEE CO, LTD, ET AL.**

Jonathan M. Freed
Didie Muller

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC  20003
Tel:  (202) 223-3760
jfreed@tradepacificlaw.com

***Counsel to Plaintiffs and
Plaintiff-Intervenors***

**Dated: February 17, 2026**

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................. i

**TABLE OF AUTHORITIES** ........................................................................................ ii

I.    STATEMENT PURSUANT TO RULE 56.2(c) ..................................................... 1

    A.   Administrative Determination Under Review .................................................. 1

    B.   Issues Presented ............................................................................................. 2

    C.   Standard of Review ......................................................................................... 2

II.    STATEMENT OF FACTS ................................................................................... 3

III.   ARGUMENT ....................................................................................................... 6

    A.   Commerce's Selection Of Egypt Instead of Ukraine As The Primary Surrogate Country Was Not Supported By Substantial Evidence ...................................................... 6

        1.   The Ukrainian information to value the honey raw material, the main input, was superior to the Egyptian information .................................................................. 9

        2.   The Ukrainian information to value drums, the second most important input, was superior to the Egyptian information ............................................................. 17

        3.   The labor information available from Ukraine better satisfied Commerce's surrogate value selection criteria .......................................................................... 19

        4.   The electricity information from Ukraine better satisfied the surrogate value selection criteria ........................................................................................... 20

        5.   The water information available from Ukraine better satisfied the surrogate value selection criteria ........................................................................................... 21

        6.   The information available for truck freight and brokerage did not favor selecting Egypt over Ukraine as the surrogate country ................................................... 22

IV.   CONCLUSION ................................................................................................. 23

## TABLE OF AUTHORITIES

<u>Cases</u>

*Fujitsu General. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996)............................................2

*Consolo v. FMC*, 282 U.S. 607 (1966) ...........................................................................................2

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ..............................................................2

*PAM, S.p.A. v. United States*, 582 F.3d 1336 (Fed. Cir. 2009)......................................................2

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ..............................................3

*Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008)....................................3

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...............................................................3

*Rhone-Poulenc, Inc. United States*, 20 CIT 573, 927 F. Supp. 451 (1996)....................................3

*Asociación Colombiana de Exportadores de Flores v. United States*, 22 CIT 173, 6 F. Supp. 2d 865 (1998)......................................................................................................................................3

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995)..............................................3

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed.Cir.2010) ........................................................6

*Vinh Hoan Corp. v. United States*, 49 F.Supp.3d 1285 (Ct. Int'l Trade 2015).................................6

*Qingdao Sea–Line Trading Co. v. United States*, 766 F.3d 1378 (Fed.Cir.2014).........................7

*Jiaxing Bro. Fastener Co., Ltd. v. U.S.*, 822 F.3d 1289 (Apr. 21, 2016).........................................8

*Shakeproof Assembly Components v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) ..................9

*Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442 (Fed.Cir.1994).......................................9

<u>Statutes</u>

28 U.S.C. § 1581(c) .........................................................................................................................2

19 U.S.C. § 1516a(b)(1)(B)(i)..........................................................................................................2

19 U.S.C. § 1677b(c) ...............................................................................................................6, 7, 9

**Regulation**

19 C.F.R. § 351.408(c)(2) ................................................................................................6

**Administrative Determinations**

*Raw Honey From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review; 2021-2023*, 90 Fed. Reg. 15,553 (Dep't Commerce Apr. 14, 2025), and accompanying Issues and Decision Memorandum ........................1, 4, 5, 7, 10–12, 14, 15, 19–22

*Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501 (June 10, 2022) .........................................................4

*Raw Honey From Vietnam: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 55,554 (July 5, 2024), and Accompanying Preliminary Decision Memorandum ...............................................................................5

*Raw Honey From India: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 56,306 (July 9, 2024) .....................................5

*Raw Honey From Brazil: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 55,582 (July 5, 2024) .....................................5

*Raw Honey From Argentina: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 55,915 (July 8, 2024) .....................................5

*Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,184 (Apr. 14, 2022), and accompanying Issues and Decision Memorandum ...................5

*Drawn Stainless Steel Sinks From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 76,174 (Nov 6, 2023), accompanying Issues and Decision Memorandum ................................................................................8

**Other Authorities**

Policy Bulletin 04.1 ...............................................................................................6, 7

Ct. No. 25-00085

**MEMORANDUM IN SUPPORT OF PLAINTIFFS AND
PLAINTIFF-INTERVENORS' MOTION FOR
JUDGMENT UPON THE AGENCY RECORD**

## I.     STATEMENT PURSUANT TO RULE 56.2(C)

Plaintiffs Ban Me Thuot Honeybee Joint Stock Company, Daklak Honeybee Joint

Stock Company, Dak Nguyen Hong Exploitation of Honey Company Limited TA, Daisy Honey

Bee Joint Stock Company, Hoa Viet Honeybee One Member Company Limited, and Hanoi

Honeybee Joint Stock Company ("Plaintiffs") and Bao Nguyen Honeybee Co., Ltd., Dongnai

Honey Bee Corp., Huong Rung Trading-Investment and Export Company Limited, Hoang Tri

Honey Bee Co., Ltd., Nhieu Loc Company Limited, Southern Honey Bee Co., Ltd., Thanh Hao

Bees Co., Ltd., Viet Thanh Food Co., Ltd., and Spring Honeybee Co. Ltd., ("Plaintiff-

Intervenors") submit this brief in support of its Motion for Judgment upon the Agency Record

pursuant to USCIT Rule 56.2.

### A.  Administrative Determination Under Review

This action seeks a judgment on the agency record with respect to the determinations

made by the United States Department of Commerce ("Commerce") in *Raw Honey From the*

*Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review; 2021-*

*2023*, 90 Fed. Reg. 15,553 (Dep't Commerce Apr. 14, 2025) ("*Final Results*"), and

accompanying Issues and Decision Memorandum (Barcode 4744467-02) ("*AR1 IDM*"). The

*Final Results* impose antidumping duties on raw honey exported from Vietnam and entered into

U.S. customs territory from August 25, 2021, through May 31, 2023, the first period of review

("POR") arising from the antidumping duty order against raw honey from Vietnam.[1]

---

[1] *See Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*,
87 Fed. Reg. 35,501 (June 10, 2022) ("*Order*").

Ct. No. 25-00085

### B. Issues Presented

By selecting Egypt as the primary surrogate country, Commerce failed to select the best available information and failed to calculate the weighted-average antidumping duty rates accurately, rendering its decision as lacking a basis in substantial evidence. In furtherance of its statutory obligation to rely on the best available information to calculate normal values accurately, Commerce's practice is to consider a number of criteria including whether potential surrogate value data are publicly available, contemporaneous with the period under consideration, representative of broad-market averages, tax and duty-exclusive, and specific to the input being valued. Egypt's surrogate value data is not contemporaneous for honey, water, and movement expenses, not specific for electricity and labor, does not represent broad-market averages for water, and is unreliable for honey and drums. In contrast, the record contains complete surrogate value data for Ukraine that more completely satisfied Commerce's surrogate value selection criteria that such information be specific, contemporaneous, representative of broad market averages, tax-and duty-exclusive, and publicly available.

### C. Standard of Review

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). When evaluating factual determinations contained in the final results of an antidumping duty administrative review, the Court must sustain Commerce's final results, unless they are "unsupported by substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Fujitsu General. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. FMC*, 282 U.S. 607, 619-20 (1966) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). In order for a determination to satisfy this

Ct. No. 25-00085

standard, "{t}here must be a rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008).  Additionally, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-488 (1951).

This Court has found Commerce's determinations unlawful "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. United States*, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996); see also *Asociacion Columbiana de Exportadores de Flores v. United States*, 6 F. Supp. 2d 865, 880 (1998).  Even where Commerce has acted in conformity with its statutory and regulatory obligations, the resulting dumping margin must be examined for its accuracy and fairness.  *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

## II.    STATEMENT OF FACTS

On June 10, 2022, Commerce published an antidumping duty order covering raw honey from the Socialist Republic of Vietnam. Commerce initiated the first administrative review of the order on August 3, 2023, covering the period of review August 25, 2021, through May 31, 2023. Shortly thereafter, on October 5, 2023, Commerce selected Ban Me Thout Honeybee Joint Stock Company ("BMT") and Daklak Honeybee Joint Stock Company ("DakHoney") as the mandatory respondents and issued its initial questionnaire to them the same day.

As part of its review, Commerce requested surrogate country and surrogate value comments and information from interested parties on January 25, 2024. Commerce extended the deadline for the preliminary results to June 28, 2024, and granted extensions related to surrogate value submissions. Plaintiffs and other interested parties submitted surrogate value comments by

Ct. No. 25-00085

February 9, 2024, and submitted rebuttal surrogate country and surrogate value information by March 15, 2024, after Commerce extended the rebuttal deadline. Plaintiffs and other interested parties then submitted final surrogate value information on May 29, 2024, followed by pre-preliminary comments on June 10, 2024.

On June 28, 2024, Commerce signed its surrogate value memorandum selecting Egypt as the primary surrogate country and determining that the financial statements of Kejriwal Bee Care India Private Limited ("Kejriwal") and Brij Honey Private Limited ("Briji") were appropriate for use in calculating financial ratios.[2] Commerce published the preliminary results on July 5, 2024, calculating preliminary antidumping duty margins of 100.54% ad valorem for BMT and 154.47% for DakHoney, along with margins for separate rate companies and the Vietnam-wide entity.[3] In the *Preliminary Results*, Commerce stated that it selected Egypt over Ukraine as the primary surrogate country because (1) Egypt was on the Office of Policy list of potential surrogate countries and (2) Egypt provided monthly prices for raw honey, albeit from 2019.[4] In the *Final Results*, Commerce abandoned these two rationales with an alternative justification for selecting Egypt instead of Ukraine as the primary surrogate country.[5]

The administrative review underlying this appeal arises out of antidumping duty orders covering four countries, Argentina, Brazil, India, and Vietnam.[6] In those other administrative reviews, the preliminary weighted average rates Commerce determined were 0 percent to 0.59

---

[2] Memorandum to the File: Preliminary Surrogate Values, (June 28, 2024) (posted 7/2/2024), PD 246.
[3] *Raw Honey From Vietnam: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 55554 (July 5, 2024), PD 249, and Accompanying Preliminary Decision Memorandum, (June 28, 2024) (posted 7/1/2024), PD 242.
[4] Preliminary Decision Memorandum, page 15, PD 242.
[5] *AR1 IDM*, 19-23, PD 305.
[6] *Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35501, 35503 (June 10, 2022).

Ct. No. 25-00085

percent for India, 0 percent to 2.31 percent for Brazil, and 0 percent to 58 percent for Argentina.[7]

In comparison to the preliminary results in the reviews of Brazil, India, and Argentina, the

*Preliminary Results* for Vietnam were an outlier driven by Commerce's preliminary surrogate

country decision. The *Final Results* were also a significant increase from the antidumping duty

deposit rates determined in the original investigation, 61.27 percent for BMT and 58.74 percent

for DakHoney, where Commerce relied on India as the surrogate country.[8]

      Commerce conducted on-site verifications at BMT and DakHoney in Vietnam between

October and November 2024. In December 2024, Plaintiffs and other interested parties submitted

case and rebuttal briefs. Plaintiffs argued, among other things, that Egypt was not a significant

producer of comparable merchandise, that Commerce should select Ukraine as the primary

surrogate country, that Commerce should use Ukrainian government statistics to value raw

honey even if Commerce did not select Ukraine as the primary surrogate country, and that

Commerce should value drums using imports into Ukraine.

      Commerce published the *Final Results* on April 14, 2025, calculating final weighted-

average dumping margins of 100.72% ad valorem for BMT and 156.96% for DakHoney. In its

final calculations, Commerce continued to use Egypt as the primary surrogate country and relied

on surrogate value information from Egypt. Commerce set forth the legal bases for its final

determinations in an unpublished Issues and Decision Memorandum dated April 7, 2025.

---

[7] *Raw Honey From India: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 56306 (July 9, 2024); *Raw Honey From Brazil: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 55582 (July 5, 2024); and *Raw Honey From Argentina: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 55915 (July 8, 2024).

[8] *Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,184 (Apr. 14, 2022) ("*Final Determination*"), and accompanying Issues and Decision Memorandum, April 7, 2022 (Barcode: 4230362-02) (available at https://access.trade.gov/public/FRNoticesListLayout.aspx last accessed on Feb. 17, 2026).

Ct. No. 25-00085

## III.    ARGUMENT

### A. Commerce's Selection Of Egypt Instead of Ukraine As The Primary Surrogate Country Was Not Supported By Substantial Evidence

In antidumping duty cases involving exports from Vietnam, a country regarded as a non-market economy by Commerce, Commerce determines normal value by valuing the factors of production utilized in producing the subject merchandise using prices or costs from "one or more market economy countries that are (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."[9]

To do this, Commerce selects a market economy country as the primary surrogate country. 19 C.F.R. § 351.408(c)(2). The process of choosing a market economy country to value the factors of production is known as surrogate country selection. *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed.Cir.2010).

For more than twenty years, Commerce has followed a multi-step process to select a surrogate country:

(1) Commerce assembles a non-exhaustive list of potential surrogate countries that are at a comparable level of economic development to the non-market economy country; (2) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (3) if more than one country is economically comparable and a significant producer of comparable merchandise, Commerce will select the country with the best data for valuing the factors of production. *See Vinh Hoan Corp. v. United States*, 49 F.Supp.3d 1285, 1292 (Ct. Int'l Trade 2015) (internal quotation marks omitted) (citing, "Non-Market Economy Surrogate Country Selection Process," (March 1, 2004) (Policy Bulletin 04.1),available at https://access.trade.gov/Resources/policy/bull04-1.html).

---

[9] 19 U.S.C. § 1677b(c)(1) & (4)(b).

Ct. No. 25-00085

The statute directs Commerce to value the factors of production using "the best available information" in a market economy. 19 U.S.C. § 1677b(c)(1). "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Qingdao Sea–Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed.Cir.2014).

Following its regulatory preference to use one surrogate country, 19 C.F.R. § 351.408(c)(2), when several countries are both at a level of economic development comparable to the nonmarket economy country and significant producers of comparable merchandise, Commerce evaluates the reliability and completeness of the data in the similarly-situated surrogate countries and selects the one with the best data as the primary surrogate country.[10]

In the underlying review, Commerce found that Egypt and Ukraine were both economically comparable to Vietnam.[11]  Commerce also found that both Egypt and Ukraine were significant producers of comparable merchandise but recognized that Ukraine was a much larger producer.[12]  Commerce summarized that "Production statistics from the FAO indicate that Ukraine and Egypt accounted for 4.4 percent and 0.3 percent (or 63,079 and 4,040 metric tons of global natural honey production quantity out of 1,675,149 metric tons), respectively, for 2022."[13] Regardless of whether Egypt is a significant producer of comparable merchandise, the extent and significance of the honey production in the two countries is relevant to evaluating the overall robustness and quality of the data from each country.

---

[10] Policy Bulletin 04.1, (stating, "the country with the best factors data is selected as the primary surrogate country…. data quality is a critical consideration affecting surrogate country selection.").
[11] *AR1 IDM*, at 20 (PD 305) ("Egypt is on the Surrogate Country List, and is economically comparable. Although Ukraine is not on the Surrogate Country List, it is within the range of GNIs of the countries on the Surrogate Country List and accordingly we find that it is economically comparable to Vietnam.").
[12] *Id.*, at 14 (PD 305).
[13] *Id.*, (citing, BMT's Letter, "Comments on List of Economically Comparable Countries," dated February 9, 2024, at Exhibit 1 (PD 130-133).

Ct. No. 25-00085

Having found that both countries were economically comparable to Vietnam and significant producers of honey, Commerce's decision hierarchy regarding which country to select as the surrogate country should have next considered which country offered the best, most accurate data.

The subject merchandise in this case, raw honey, is similar to other cases where a single factor of production comprises the majority of the cost of manufacture. In those cases, Commerce's reasonable approach is to base its surrogate country selection largely on which country offers the best information for this main material.[14] The information available from Ukraine to value the raw honey better satisfied the surrogate value selection criteria than the information available from Egypt and Commerce's decision to select Egypt cannot be sustained as having a basis in substantial evidence. As demonstrated below, Commerce ignored flaws in the data it selected, the Egyptian honey prices. Moreover, its reason for disregarding the Ukrainian honey prices, that Russia's war with Ukraine rendered the data unreliable, lacked any basis in the record because the Ukrainian honey prices predated Russia's invasion of Ukraine. Thus, Commerce's sole rationale for disfavoring the Ukrainian honey value is disproven by the record evidence.

In addition to the superiority of the raw honey surrogate information from Ukraine, Ukraine offered better information for the second most important input (drums), more specific information for electricity, more contemporaneous and representative information for water, and equally representative and contemporaneous information for truck freight and brokerage. As

---

[14] *See e.g.*, *Jiaxing Bro. Fastener Co., Ltd. v. U.S.*, 822 F.3d 1289, 1301 (Apr. 21, 2016) (sustaining as reasonable Commerce's emphasis on the quality of the information available for valuing the main input in making the surrogate country selection decision), *see also Drawn Stainless Steel Sinks From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 76,174 (Nov 6, 2023), accompanying Issues and Decision Memorandum, Comment 2 (Barcode:4454395-02) (stating, in cases where there is one main input used to produce subject merchandise, data specificity was the prevailing factor in selecting the primary surrogate country.)

Ct. No. 25-00085

will be explained below, Commerce's concerns about the data from Ukraine were based on speculation and conclusions that cannot be supported in the record. At the same time, Commerce ignored flaws in the Egyptian data with inadequate and irrelevant reasoning.

As expressed above, the statute leaves flexibility for Commerce to select surrogate countries and surrogate values, but its primary mandate is that Commerce value the factors of production using "the best available information." 19 U.S.C. § 1677b(c)(1). The purpose of the statutory provisions is to determine antidumping margins "as accurately as possible."[15] As demonstrated below, Commerce did not reasonably consider the information on the record and failed to select the best available information when selecting the primary surrogate country which resulted in inaccurate antidumping margins.

### 1. The Ukrainian information to value the honey raw material, the main input, was superior to the Egyptian information

The comparison of the quality of the competing datasets to value the beekeeper honey, which is the most important input, weighed in favor of selecting Ukraine as the surrogate country. For the primary direct material FOP, input raw honey, Ukraine offered two sources of surrogate value data: 1) publicly-available information regarding the annual volume and selling price of raw honey in Ukraine sourced from the State Statistics Service of Ukraine ("SSSU") for 2021 for 25 regions within Ukraine; and 2) FAO natural honey producer prices of raw honey for Ukraine for 2021.[16] The record contained only one source of data for raw honey from Egypt. The Egyptian honey source was from 2019, or **two years** prior to the start of the POR.[17]

---

[15] *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001), *citing Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed.Cir.1994).

[16] *See* BMT's Final SV Submission, at Exhibit SV-2 (PD 215-216); see also Letter from Kelley Drye & Warren LLP, "Petitioners' Surrogate Country and Preliminary Surrogate Value Comments" (Feb. 29, 2024) ("Petitioners SV Submission"), at Exhibit UKR-1A (PD 161-187).

[17] *See* BMT's "Comments on Surrogate Values" (Feb. 29, 2024) ("BMT's SV Submission"), at Exhibit SV-2.A (PD 146-151); see also Petitioners SV Submission, at Exhibit EGY-1A (PD 161-187).

Ct. No. 25-00085

Moreover, as further discussed below, the Egyptian honey price is inexplicably higher than average Egyptian finished packed honey export price for the same time period.[18]  Thus, not only is the Ukraine data more contemporaneous, overlapping with five months of the POR, the Ukraine honey surrogate value represents a broad market average, with producer prices from 25 regions with detailed quantity and values, representing over 253,302 tons of raw input honey in 2021.[19]  Moreover, this Ukraine SV data is substantiated by another source from FAOSTAT for Ukraine for 2021 as well as historical data from SSSU for 2019 and 2020.[20]

In contrast, the FAO pricing data for Egypt is from 2019, or two years prior to the start of the POR.[21]  This surrogate value is not contemporaneous.  Moreover, the Egyptian honey producer price appears anomalous when compared to average export prices from Egypt of finished packed honey during the same time period, 2019.[22]  The weighted average export price of finished honey from Egypt in 2019 was 2,274 USD per metric ton ("MT"), almost 30 percent lower than the FAO producer price for Egypt, when converted to USD per MT.[23]  This export price for finished packed honey already includes processing costs, and yet, was inexplicably 30 percent lower than the input raw honey price, prior to processing, for the same time period.

In the *Final Results* Commerce failed to explain why the Egyptian FAO producer prices were reliable when the export prices were inexplicably lower, and significantly so, than the export prices for processed, packed honey.  Instead, Commerce suggested possible explanations why the two datasets are different.  Commerce stated that they did "not have enough information on the record to conclude why" the reported FAO producer prices were significantly higher than

---

[18] See Letter White & Case LLP, "Rebuttal Response to Petitioners' Surrogate Country and Initial Surrogate Value Comments" (Mar. 15, 2024) ("DakHoney's SV Rebuttal Submission"), at Exhibit 2 (PD 198).
[19] BMT's Final SV Submission, at Exhibit SV-2 (PD 215-216)
[20] *Id.*, and Petitioners SV Submission, at Exhibit UKR-1A (PD 161-187).
[21] *See* Petitioners SV Submission, at Exhibit EGY-1A (PD 161-187).
[22] *See* DakHoney's SV Rebuttal Submission, at Exhibit 2 (PD 198).
[23] *Id.* (PD 198).

Ct. No. 25-00085

processed, packed honey exported from Egypt.[24]  Commerce also speculated that "the same subclassifications of honey" were not being reported in the UN Comtrade export data and the FAO producer price data.[25]  Commerce also noted that the FAO producer prices are based on simple averages and not weighted averages as was the basis for reporting in the UN Comtrade data.[26]  This acknowledgement that the FAO data represents simple averages, rather than weighted averages, further weakens the characterization of the FAO producer prices as representative of a broad market average.  The FAO prices are simple averages of unit prices and there is no way of knowing whether that simple average is skewed by small quantity high priced observations. This fact undermines the claim that the Egyptian FAO data is a broad, market average.

Commerce's determination that the Egyptian honey FAO honey price better satisfy its surrogate value selection criteria than did the SSSU honey price cannot be sustained as reasonable.  The Ukraine SSSU data is contemporaneous, and the Egyptian FAO data is not. The record does not contain any information that indicates that the Ukraine SSSU data might not be reliable while the record contains the UN Comtrade Egyptian export prices which are thirty percent lower than the reported producer prices.  Moreover, the Ukraine SSSU data has supporting reference values from 2019 and 2020.  Based on these facts alone, the Ukraine SSSU data better satisfy Commerce's surrogate value selection criteria.

Commerce's only reason for preferring the Egyptian FAO honey prices over the Ukraine SSSU honey prices was its general conclusion that Russia's invasion of Ukraine made Ukraine unsuitable as a surrogate country.[27]  Commerce based its conclusions regarding the impact of

---

[24] *AR1 IDM,* at 21.
[25] *Id*.
[26] *Id*.
[27] *AR1 IDM*, at 22-23.

Russia's invasion of Ukraine solely on statements and information included in the annual report

of Kernal Holding S.A. ("Kernal"), an agribusiness company focused on the production and

export of sunflower oil.[28]  The record does not contain any information describing how Russia's

invasion impacted Ukraine's honey production. Commerce disregarded the Ukrainian data based

on an unspecified, generalized assessment that agribusiness in Ukraine was impacted by the

Russian invasion of Ukraine.

Commerce's assessment that the Russian invasion "impacted" Ukraine's honey industry

is speculative.  But in addition, Commerce's speculation that Russia's war impacted the available

information on the record regarding Ukrainian honey prices is directly contradicted by the facts

in this case.  The Ukraine FAO price submitted by the Petitioner was from 2021[29] and the

Ukraine SSSU honey price submitted by respondents was also from 2021.[30]  Russia's invasion of

Ukraine did not occur until February 2022.[31] The honey prices from Ukraine were from prior to

Russia's invasion.  Thus, Commerce's conclusion that Russia's war in Ukraine impacted the

honey industry "such that Ukrainian raw honey prices would not be suitable" as a surrogate

value cannot be sustained.  There is no rational basis to conclude that that 2021 honey prices

were impacted by a 2022 invasion into Ukraine by Russia.  Thus, Commerce's **sole** rationale for

disregarding the Ukrainian honey prices lacks any basis in the record evidence.

Again, there is no evidence that the Ukrainian SSSU honey prices are unreliable.  As

explained above, Russia's invasion of Ukraine occurred after the time period for which

Ukrainian honey prices were reported.  Thus, Commerce's only basis for disregarding the

---

[28] *AR1 IDM*, at 23(PD 305), *see also*, "Petitioners' Surrogate Country and Preliminary Surrogate Value Comments," (Feb. 29, 2024), at Exhibit UKR-6 ("Petitioners' SV Comments) (PD 161-187).
[29] Petitioners' SV Comments, Exhibit UKR-2 (PD 161-187).
[30] BMT's 30-Day SV Submission, at Exhibit SV-2 (PD 231-235).
[31] *AR1 IDM,* at 22-23, *citing* Petitioners' SV Submission, Exhibit UKR-6 (Kernal's FY2023 Annual Report) at Sustainability: Human Capital ((PD 161-187).

Ct. No. 25-00085

Ukrainian SSSU honey prices is untenable.  In contrast, the record contains specific information indicating that the Egyptian, FAO simple-average producer prices appear unrepresentative of a broad market average because the UN Comtrade export prices for packed, finished honey during the same period were thirty percent higher than the FAO simple average prices.  But in addition to these infirmities in the Egyptian data, those data were also unreliable due to the inflation and currency conditions in Egypt.

The existence of high inflation and unstable currency valuation in Egypt further diminished the quality of the Egyptian FAO prices.  As discussed below, Commerce did not adequately address these problems with the Egyptian data and this factor also should have weighed heavily against Commerce determining that the Egyptian FAO prices for honey were of better quality and representativeness than the Ukraine SSSU weighted-average prices.

Egypt's consumer price index ("CPI") increased by 49 percent from August 2021 to May 2023, the first and last month of the POR.[32]  For the last five months of the POR, Egypt experienced monthly year over year inflation of 26 to 33 percent.[33]  Furthermore, Egypt's record inflation during the POR was primarily driven by food prices, thereby impacting surrogate values of food material inputs in processing a food product:

- Annual food inflation recorded 29.9 percent in November 2022
- Annual food inflation increased to 37.2 percent in December 2022
- Annual food inflation increased to 60.0 percent in May 2023.[34]

The lack of contemporaneity to the honey surrogate value is also especially important here considering the deteriorating economic conditions in Egypt.  As explained above, the

---

[32] *See* BMT Case Brief, Attachment C, (derived from Preliminary Surrogate Value Memorandum, June 28, 2024 (Barcode 4588854) (Preliminary Surrogate Value Memo") (CR 258; PD 280) and BMT's Rebuttal Comments and Information Relating to Petitioner's Surrogate Value Submission", June 10, 2024, at Exhibit 1, ("BMT's 30-day SV Rebuttal") (PD 231-235).
[33] BMT's 30-day SV Rebuttal, Exhibit 1 (PD 231-235).
[34] *Id.*, at Exhibit 2 (PD 231-235).

Ct. No. 25-00085

Egyptian honey value was from two years prior to the start of the POR.[35]  Thus, this surrogate

value was inflated by 130 percent to POR values due to Egypt's high inflation.[36]  Using an

average POR inflator masked the extraordinary high monthly variability of Egyptian inflation

over an extended 22-month POR.[37]  The CPI for the first month of the POR, August 2021,

compared to CPI for 2019 yields an inflation rate of 11 percent while the same comparison of

2019 CPI to the CPI of the last month of the POR, May 2023, yields an inflation rate of 65

percent.[38]  If raw honey input is inflated using monthly inflators rather than one average POR

inflation, the honey surrogate value varies from 59,277 EGY per kilogram to 88,344 per

kilogram, or prices that are 49 percent higher at the end of the POR versus the beginning of the

POR.[39]  Thus, Commerce's methodology to use a 2019 Egyptian surrogate value, inflated by the

22-month POR CPI, for one POR average of 69,957 EGY per kilogram, significantly distorted

the normal value for the beginning of the POR, when Egyptian inflation was significantly lower.

Commerce's calculated results were inaccurate and distorted because Commerce relied

on a non-contemporaneous surrogate value for the primary input and used an inflation

adjustment factor averaged over a 22 month period, a period for which Egypt experienced very

high price inflation.  Yet, Commerce ignored these concerns and still preferred the Egyptian

honey prices over the Ukrainian SSSU prices.

Commerce's response with regard to how Egypt's high inflation undermined the

accuracy to Commerce's normal value calculation failed to address the problem.  Commerce did

not explain, despite the concerns regarding Egypt's inflation, how the Egyptian FAO data were

---

[35] *See* Petitioners SV Submission, at Exhibit EGY-1A (PD 161-187).
[36] *See* Preliminary Surrogate Value Memo, at Attachments I and II (PD 246-248); see also BMT's Brief, at Attachment C (CR 258; PD 280).
[37] BMT's Brief, at Attachment C (CR 258; PD 280).
[38] *Id*. (CR 258; PD 280).
[39] *Id*.(CR 258; PD 280).

**Ct. No. 25-00085**

the best available information for calculating normal value accurately. Instead, Commerce stated that it "has not formally made a finding that Egypt has high inflation for purposes of surrogate country selection."[40]  Commerce also noted "that hyperinflation is not a basis or criterion for surrogate country selection."[41]

First, whether Commerce made a formal finding that Egypt had high inflation is irrelevant.  The facts demonstrate that Egypt did have high inflation. The concern is that those high inflation conditions contributed to inaccurate surrogate values for the main raw material and thus inaccurate normal values.  Commerce did not address this concern. Second, that the inflation conditions of a country are not a criterion specified in Commerce's surrogate country or surrogate value selection criteria also misses the point.  The question Commerce is required to answer is which set of data, Egypt's or Ukraine's, is best in terms of quality, reliability, and accuracy.  The high inflation that Egypt experienced renders the non-contemporaneous FAO price of even lesser quality and reliability when compared to the contemporaneous SSSU values from Ukraine and makes it impossible to reasonably conclude that the Egyptian data were better than the Ukrainian data.

In addition, Egypt's currency fluctuation and devaluation further undermined the reliability of the Egyptian FAO honey value.  During the 22-month POR, Egyptian exchange rates used by Commerce in the antidumping duty calculations declined by 49 percent.[42]  In its case brief, BMT demonstrated the distortions these fluctuations injected into Commerce's calculations by comparing the normal values for identical CONNUMs at different dates of sale

---

[40] *AR1 IDM*, at 22 (PD 305).
[41] *Id.* (PD 305).
[42] *See* BMT Case Brief, at Attachment 4, (CR 254-258; PD 276-280), *citing* BMT's 30-day SV Rebuttal, at Exhibit 3.1 (PD 231-235).

Ct. No. 25-00085

during the POR which showed a decline by [83] percent in the normal value.[43]  Additionally BMT's overall dumping margins show these same inaccurate and distorted results, where antidumping margins in the beginning of the POR range from [249 to 304] percent whereas margins at the end of the POR range from [31 to 40] percent.[44]  BMT's normal value is calculated using BMT's 22-month POR-average factors of production applied to Egyptian SVs and converted to USD using the exchange rate of the applicable U.S. comparison sale.  Thus, the only change in normal value for identical CONNUMs, as this case here, is Egyptian Pound per USD exchange rate of the U.S. date of sale.  That is, Commerce has applied normal values that are [83] percent higher at the beginning of the POR versus the end of the POR, due solely to Egyptian Pound / USD exchange rate, which has nothing to do with BMT's costs or selling behavior.

The Egyptian exchange rate had the pivotal declines in March 2022, October 2022, and January 2023, when the Central Bank of Egypt devalued the Egyptian pound.[45]  The distortions to respondents costs caused by the Central Bank of Egypt's direct intervention in Egyptian currency conversion is further apparent where the calculated Egyptian honey surrogate value in USD per kilogram applied to respondents costs changed by as much as 17 percent over only a 30 day period following these Government devaluations.[46]

In summary, Commerce sole rationale for disregarding the Ukrainian SSSU honey price was based on its untenable theory that Russia's 2022 invasion of Ukraine impacted the 2021 SSSU honey prices.  Ukraine offered contemporaneous honey prices from a government

---

[43] *See* BMT Case Brief, at 17, (CR 254-258; PD 276-280) *citing* Prelim Analysis Memo, at Attachment II, p. 17, comparing BMT SEQU 4 to 164 (CR 185-187; PD 245).
[44] *See* Prelim Analysis Memo, at Attachment II, p. 17 (PD 248).
[45] *See* BMT's 30-day SV Rebuttal, at Exhibit 3.2 (PD 231-235).
[46] *See* BMT Case Brief, at Attachment C (CR 258; PD 280).

Ct. No. 25-00085

statistical source that predated Russia's invasion of Ukraine. Egypt's honey value was not contemporaneous. Egypt's FAO producer price was inexplicably higher, and significantly so, than the export prices for finished, packed honey. The representativeness and reliability of the Egyptian non-contemporaneous FAO producer price was diminished even further by the inflation and currency exchange conditions in Egypt during the period of review. Yet, Commerce ignored these flaws in the Egyptian data while making disproven conclusions that the Ukrainian honey data were unreliable. Had Commerce reasonable considered the information on the record from Egypt and Ukraine regarding the honey prices, this factor alone should have caused Commerce to select Ukraine as the primary surrogate country. But, as discussed in more detail below, the information available for the second most important input, labor, electricity, and water all also weighed in favor of selecting Ukraine over Egypt as the surrogate country.

**2. The Ukrainian information to value drums, the second most important input, was superior to the Egyptian information**

The record contains complete POR import data for Ukraine from Trade Data Monitor ("TDM") for other direct materials and packing materials as well as the quantity and value of drums sold within Ukraine for 2017-2019 from SSSU.[47] The Ukraine TDM data is contemporaneous and reliable. The record does not contain any information indicating that the Ukrainian drum values are not specific, anomalous, or otherwise unreliable. In contrast, the Egyptian information for drums possessed anomalies in import quantities as further discussed below.

---

[47] *See* BMT's 30-Day SV Submission, at Exhibit SV-3 (PD 231-235); *see also* Petitioners SV Submission, at Exhibits UKR-1B, UKR-4 and UKR-7 (PD 161-187).

Ct. No. 25-00085

The record contains complete POR import data for Egypt from TDM and Global Trade Atlas ("GTA").[48]  However, a comparison of import data for Egypt for drums, the next most significant direct material FOP after honey, from TDM and GTA shows unexplained inconsistencies in import quantities.  Missing import quantities in Egypt's GTA import data, for May 2023 in particular, cause a 206 percent higher AUV when using import data from GTA versus import data from TDM, demonstrating the unreliability of Egyptian import data for drums.[49]  The Egyptian import quantity for May 2023 in TDM data shows 1.1 million kilograms, which is more than 1 million kg higher than the import quantity for May 2023 in GTA data of 0.1 million kg.[50]  Nor surprisingly, the import AUV for May 2023 alone is more than twice the AUV of the rest of the POR using GTA data.[51]  This missing import quantity in GTA data significantly skews the AUVs demonstrating the unreliability of Egyptian import data for drums.  Moreover, the 6.07 USD per kilogram Egyptian AUV used by Commerce in the *Final Results* is more than double the AUV of imports into Ukraine of 2.56 USD per kilogram.[52] This further demonstrates the unreliability of the GTA data used by Commerce and the distortions to normal value caused through Commerce's reliance on Egyptian import data for drums.  Commerce could not have reasonably concluded that the Egyptian data for drums was of better quality than the Ukrainian data for drums.  Thus, the available information for the second most important material input weighed in favor of selecting Ukraine as the surrogate country.

---

[48] *See* SV Memo, at Attachments I and II (PD 246); *see also* Petitioners SV Submission, at Exhibits EGY-1B, EGY-4 and EGY-7 (PD 161-187).
[49] *See* **Attachment D** (CR 258; PD 280); *see also* SV Memo, at Attachments I and II (PD 246); *see also* Petitioners SV Submission, at Exhibits EGY-1B, EGY-4 and EGY-7 (PD 161-187).
[50] *Id.* (CR 258; PD 280, 246, 161-187).
[51] *Id*. (CR 258; PD 280, 246, 161-187).
[52] *See* Petitioners SV Submission, at Exhibit UKR-1B (PD 161-187).

Ct. No. 25-00085

**3. The labor information available from Ukraine better satisfied Commerce's surrogate value selection criteria**

The labor wage data on the record from Egypt and from Ukraine overlapped with parts of the POR, but the wage rate category for Ukraine was of better specificity than the wage rate data from Egypt. The record contains 2022 labor rates for plant and machine operators, and assemblers for Egypt from the International Labor Organization ("ILO").[53] In contrast, the record contains 2021 labor rates from Ukrainian government data, https://stat.gov.ua/, specific to "Manufacture of food products; beverages and tobacco products."[54]

In the *Final Results*, Commerce did not compare the relative quality or specificity of the two sets of labor wage information in making its surrogate country selection criteria. BMT argued that the superior specificity of the Ukrainian labor wage data compared to the Egyptian labor information weighed in favor of selecting Ukraine over Egypt.[55] However, Commerce did not compare the two. Instead, Commerce simply concluded that the Egyptian labor surrogate value category, Plant and machine operators, and assemblers, "is applicable to the respondent's plant and factory workers."[56] Commerce did not consider that the labor category "Manufacture of food products; beverages and tobacco products" from Ukraine was more specific to the Vietnamese respondents' labor than was the Egyptian labor category of "Plant and machine operators, and assemblers." The subject merchandise is raw honey. The Vietnamese respondents are not "assemblers" and the Ukrainian category is on its face more specific to the category of labor used by the respondents. Commerce did not engage in any comparison of the relative specificity of the labor information available.

---

[53] *Id.*, at Exhibit EGY-2 (PD 161-187).
[54] BMT's Final SV Submission, Exhibit SV-4, May 29, 2024 (PD 215)
[55] BMT's Case Brief, at 11 (CR 254; PD 276).
[56] *AR1 IDM*, at 21.

19

Ct. No. 25-00085

Instead, Commerce simply dismissed the labor information from Ukraine concluding that labor was "severely impacted during the war, thus we conclude that based on available record evidence that Ukrainian values for these items would similarly be unreliable and therefore this consideration weighs heavily against concluding that Ukraine offers the best available information."[57] But as with the honey value discussed above, Commerce's reasoning cannot be supported. The labor information for Ukraine was from 2021, covering the early part of the POR, prior to Russia's invasion of Ukraine. Russia invaded Ukraine in 2022 and the record information regarding labor disruptions indicated that those disruptions did not begin until February 2022.[58] Thus, the labor information from August 2021 to December 2021 from Ukraine was not impacted by Russia's invasion of Ukraine. Accordingly, Commerce's rationale for concluding that the labor information available weighed in favor of selecting Egypt over Ukraine is disproven by the record.

### 4. The electricity information from Ukraine better satisfied the surrogate value selection criteria

The record contains 2021 and 2022 electricity rates for Egypt from the Ministry of Electricity & Energy of Egypt.[59] The electricity information from Ukraine is from the first half of 2021, only a few months before the POR.[60] The electricity surrogate value for Egypt is less specific than the Ukraine surrogate value information for electricity because the Egyptian electricity rates do not distinguish between commercial use versus household consumer use. In contrast, the electricity rates on the record from Ukraine are specific to "non-household consumer."[61] Commerce dismissed the Ukrainian electricity information as less fitting for use as

---

[57] *Id.*, at 23.
[58] *Id.*, at 22-23, *citing* Petitioners' SV Submission, Exhibit UKR-6 (Kernal's FY2023 Annual Report) to Sustainability: Human Capital ((PD 161-187).
[59] Petitioners' SV Submission, at Exhibit EGY-3A (PD 161-187).
[60] *Id.*, at Exhibit UKR-3A (PD 161-187).
[61] *Id.*

Ct. No. 25-00085

a surrogate value because those values were "severely impacted by the war."[62]  However, as with

the honey value and labor wage rates, the electricity rates were from the period before Russia's

invasion of Ukraine.  Thus, the only reason Commerce provided for preferring Egyptian

electricity rates rather than Ukrainian electricity rates is disproven by the record.  Moreover, the

Ukrainian electricity rates are more specific to the factor of production being valued.  Thus,

Commerce cannot have reasonably concluded that the Egyptian electricity surrogate value better

satisfied the surrogate value selection criteria than did the Ukrainian electricity data.

### 5.  The water information available from Ukraine better satisfied the surrogate value selection criteria

The record contains water tariff rates for Cairo and Alexandria, as published by IBNET

from June 2018.[63]  Thus, the water information available from Egypt precedes the POR by more

than three years, which results in an inflation adjustment of forty-three percent.[64]  Moreover, the

water information available for Egypt is not a broad market average covering rural areas where

agriculture typically occurs.  The Egyptian water information was obtained from the Alexandria

Water Company and the Greater Cairo Water Company,[65] representing two urban centers in

Egypt, and none of the rural farming and nearby regions where agricultural products are typically

processed.  In contrast, the water rate information available for Ukraine was contemporaneous

with rate from January 2021 through January 27, 2022.[66]  In addition, the Ukraine water rate

information was based on rates in 39 different locations across Ukraine.[67]  Thus, the Ukraine

water rate information was contemporaneous, while the Egyptian data was not.  In addition, the

Ukraine water rate information was a broad market average while the Egyptian water rate

---

[62] *AR1 IDM*, at 23.
[63] Petitioners' SV Submission, at Exhibit EGY-3B (PD 161-187).
[64] *Id.*
[65] *Id.*
[66] *Id.*, at Exhibit UKR-3B.
[67] *Id.*

Ct. No. 25-00085

information was from only two urban centers in Egypt. Commerce's *Final Results* did not address or compare the relative quality of the information available for water in making its surrogate country decision.  But, even if one could reasonably discern that Commerce dismissed Ukraine's water rate information due to Russia's invasion of Ukraine, this rationale could not be supported in the record because the Ukraine water rate information was from January 2022, prior to Russia's invasion of Ukraine but still contemporaneous with the POR.

### 6. The information available for truck freight and brokerage did not favor selecting Egypt over Ukraine as the surrogate country

In the *Final Results*, Commerce stated "transportation, energy, and labor were severely impacted during the war, thus we conclude that based on available record evidence that Ukrainian values for these items would similarly be unreliable and therefore this consideration weighs heavily against concluding that Ukraine offers the best available information."[68] However, both the Egyptian and Ukrainian information on the record to value truck freight and domestic brokerage were from the 2020 editions of the World Bank's Doing Business reports.[69] Thus, the sources for these values were identical, but Commerce's preference for the Egyptian version cannot be supported for the reasons discussed above.  The Russian invasion of Ukraine was not until February 2022.  Commerce cannot reasonably conclude that the 2020 freight and brokerage values for Ukraine are unreliable based on Russia's invasion in 2022.  That this rationale "weighed heavily" on Commerce's decision to select Egypt over Ukraine and that this rationale cannot be supported in the record demonstrates that Commerce's surrogate country selection was not based on a reasonable consideration of the record and must be remanded as lacking a basis in substantial evidence.

---

[68] *AR1 IDM*, at 23.
[69] Petitioners' SV Submission, at Exhibits EGY-3B and UKR-3B, (PD 161-187).

Ct. No. 25-00085

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs and Plaintiff-Intervenors respectfully request that the Court grant their Motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the points set forth in this Memorandum.

Respectfully submitted,

/s/ Jonathan M. Freed
Jonathan M. Freed
Didie Muller

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC  20003
Tel:  (202) 223-3760
jfreed@tradepacificlaw.com

***Counsel to Plaintiffs and
Plaintiff-Intervenors***

**Dated: February 17, 2026**

23