**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| BAN ME THUOT HONEYBEE JSC, ET AL., | ) |
| | ) **PUBLIC VERSION** |
| | ) Contains business proprietary |
| Plaintiffs, | ) information redacted from pages 11, 28-29 |
| | ) |
| and | ) |
| | ) |
| BAO NGUYEN HONEYBEE CO, LTD, ET AL., | ) |
| | ) |
| Plaintiff-Intervenors, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) Court No. 25-00085 |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| AMERICAN HONEY PRODUCERS ASSOC. | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K HOGAN
Assistant Director

2

OF COUNSEL:

SAMUIL AGRANOVICH
Attorney
Office of the Chief
Counsel for Trade Enforcement
  & Compliance
U.S. Department of Commerce


June 9, 2026

NATALEE A. ALLENBAUGH
Trial Attorney
Commercial Litigation Branch
United States Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, DC 20044
(202) 507-6058 | natalee.allenbaugh@usdoj.gov


Attorneys for the United States

2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| BAN ME THUOT HONEYBEE JSC, ET AL., | ) |
| | ) **PUBLIC VERSION** |
| | ) Contains business proprietary |
| Plaintiffs, | ) Information redacted from pages 11, 28-29 |
| | ) |
| and | ) |
| | ) |
| BAO NGUYEN HONEYBEE CO, LTD, ET AL., | ) |
| | ) |
| Plaintiff-Intervenors, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) Court No. 25-00085 |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| AMERICAN HONEY PRODUCERS ASSOC. | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

**ORDER**

Upon consideration of plaintiffs' motion for judgment upon the agency record, the

response thereto, the reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that the motion is DENIED; and it is further

ORDERED that the Department of Commerce's final results are sustained; and it is

further

ORDERED that judgment shall enter in favor of the United States.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

Statutes, Regulations, and Rules ................................................................................. ii

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 2

    I.     Administrative Determination Under Review ......................................... 2

    II.    Issue Presented for Review ...................................................................... 2

STATEMENT OF FACTS ............................................................................................. 3

    I.     Selection of the Primary Surrogate Country ........................................... 3

    II.    The Preliminary Results ........................................................................... 6

    III.   The Final Results ..................................................................................... 11

SUMMARY OF THE ARGUMENT ........................................................................... 16

ARGUMENT ............................................................................................................... 17

    I.     Standard Of Review ................................................................................ 17

    II.    Legal Framework For Surrogate Value Selections ................................. 17

    III.   Commerce's Selection Of Egypt As The Primary Surrogate
          Country Is Supported By Substantial Evidence And Is Otherwise
          In Accordance With Law ........................................................................ 20

    IV.   Commerce's Determination That Egypt's Surrogate Data Is The
          Best Information On The Record To Value Respondents Factors
          Of Production Is Supported By Substantial Evidence And Is
          Otherwise In Accordance With Law ....................................................... 24

        A.       The Egyptian SV data for raw honey is reliable and
           suitable for use ............................................................................ 25

        B.       The Egyptian SV data for other direct materials and
           packing materials is the best information on the record ...................... 30

        C.       The Egyptian SV data for electricity, labor, water,
           and truck freight and brokerage are the best information on the
           record       32

CONCLUSION ............................................................................................................ 35

Certificate of Service ................................................................................................... 36

# TABLE OF AUTHORITIES

**Statutes, Regulations, and Rules**

19 C.F.R. § 351.309 ................................................................................................ 27, 28

19 C.F.R. § 351.408 ........................................................... 7, 8, 9, 10, 11, 19, 23, 29

19 U.S.C. § 1673 ............................................................................................................ 17

19 U.S.C. § 1677b ................................................... 3, 4, 6, 7, 18, 20, 25, 29

19 U.S.C. §§ 1677b (4) ............................................................................................ 2

28 U.S.C. § 2637 ...................................................................................................... 26

71 Fed. Reg. 40,477 (July 17, 2006) ............................................................... 19

74 Fed. Reg. 11,349 (Mar. 17, 2009) ............................................................. 19

88 Fed. Reg. 51,271, 51,276 ................................................................................ 3

88 Fed. Reg. 76,174 (Nov 6, 2023) ................................................................. 22

89 Fed. Reg. 55,554 ................................................................................................. 6

90 Fed. Reg. 15,553 ................................................................................................. 2

90 Fed. Reg. at 15,554 ......................................................................................... 16

1988 U.S.C.C.A ...................................................................................... 12, 13, 14, 15

Rule 56.2 ....................................................................................................................... 1, 2

**Cases**

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ............................................................... 17

*Baoding Yude Chem. Indus. Co., Ltd. v. United States,*,
    5 C.I.T. 1118, 170 F.Supp.2d 1335, 1343 (Ct. Int'l Trade 2001) ............................... 26-27, 29

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) ................................................................................. 34

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ................................................................................. 17

*Corus Staal BV v. United States Steel Corp.*,
    502 F.3d 1370 (Fed. Cir. 2007) ............................................................. 26, 27

*Dorbest Ltd. v. United States, 30 C.I.T. 1671*,
    462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ................................... 22, 34

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ............................................................... 17

*Home Meridian Int'l, Inc. v. United States*,
    772 F.3d 1289 (Fed. Cir. 2014) ............................................................. 30

*Jacobi Carbons AB v. United States,*
    422 F. Supp. 3d 1318 (Ct. Int'l Trade 2019) ............................................................... 25, 29, 31

*Jacobi Carbons AB v. United States,*
    992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014) .................................................................... 23, 29

*Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd. v. United States,*
    794 F. Supp. 3d 1334 (Ct. Int'l Trade 2025) ........................................................................ 18

*Jiaxing Bro. Fastener Co. v. United States,*
    11 F. Supp. 3d 1326–33 (Ct. Int'l Trade 2014) ...................................................................... 19

*Jiaxing Bro. Fastener Co., Ltd. v. United States,*
    822 F.3d 1289 (Fed. Cir. 2016) .................................................... 18, 19, 20, 22, 24, 30, 31, 35

*Jiaxing Bro.,*
    961 F. Supp. 2d ............................................................................................................... 25, 29

*Mittal Steel Point Lisas Ltd. v. United States,*
    548 F.3d 1375 (Fed. Cir. 2008) ........................................................................................... 26

*Nation Ford Chem. Co. v. United States,*
    166 F.3d 1373 (Fed. Cir. 1999) ............................................................................. 18, 19, 20-21

*Ninestar Corp v. United States,*
    687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) ....................................................................... 26

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ......................................................................... 17, 24, 32, 33

*NTN Bearing Corp. v. United States,*
    74 F.3d 1204 (Fed. Cir. 1995) ............................................................................................ 27

*QVD Food Co., Ltd. v. United States,*
    658 F.3d 1318 (Fed. Cir. 2011) ........................................................................................... 20

*Siemens Energy, Inc. v. United States, 38 C.I.T. 879,*
    992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014) .................................................................. 28, 34

*Tianjin Magnesium Int'l Co., Ltd. v. United States, No. 25-00002,*
    2026 WL 711052 (Ct. Int'l Trade Mar. 13, 2026) ............................................................... 29

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009) ........................................................................................................... 17

*Zhejiang DunAn Hetian Metal Co. v. United States,*
    652 F.3d 1333 (Fed. Cir. 2011) ........................................................................................... 18

iii

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| BAN ME THUOT HONEYBEE JSC, ET AL.,    )<br>   )<br>   )<br>Plaintiffs,    )<br>   )<br>and    )<br>   )<br>BAO NGUYEN HONEYBEE CO, LTD, ET AL.,    )<br>   )<br>   )<br>Plaintiff-Intervenors    )<br>   )<br>v.    )<br>   )<br>UNITED STATES,    )<br>   )<br>Defendant,    )<br>   )<br>and    )<br>   )<br>AMERICAN HONEY PRODUCERS ASSOC.    )<br>   )<br>Defendant-Intervenor.    )<br>   ) | **PUBLIC VERSION**<br>Contains business proprietary<br> Information redacted from pages 11, 28-29<br><br><br><br><br><br>Court No. 25-00085 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this response in opposition to the motion for judgment on the administrative record filed by the plaintiffs, Ban Me Thuot Honeybee JSC, Daisy Honey Bee Joint Stock Company, Dak Nguyen Hong Exploitation of Honey Company Limited TA, Daklak Honeybee Joint Stock Company, Hanoi Honeybee Joint Stock Company, and Hoa Viet Honeybee One Member Company Limited, as well as the plaintiff-intervenors,

Bao Nguyen Honeybee Co., Ltd., Dongnai Honey Bee Corp., Hoang Tri Honey Bee Co., Ltd., Huong Rung Trading-Investment and Export Company Limited, Nhieu Loc Company Limited, Southern Honey Bee Co., Ltd., Spring Honeybee Co. Ltd., Thanh Hao Bees Co., Ltd., and Viet Thanh Food Co., Ltd. (collectively, plaintiffs).  (ECF No. 53.)  Plaintiffs challenge certain aspects of the final results of the Department of Commerce's administrative review of the antidumping duty order covering raw honey from Vietnam, for the period of August 25, 2021, through May 31, 2023.  As demonstrated below, the challenged determination is supported by substantial evidence and is otherwise in accordance with law.  Accordingly, we respectfully request that the Court deny plaintiffs' motion for judgment upon the agency record and sustain Commerce's determination.

<strong>STATEMENT PURSUANT TO RULE 56.2</strong>

**I.      Administrative Determination Under Review**

The administrative determination under review is *Raw Honey From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review; 2021-2023*, 90 Fed. Reg. 15,553 (Dep't of Commerce Apr. 14, 2025) (*Final Results*) (P.R. 313)[1], and accompanying Issues and Decision Memorandum (IDM) (P.R. 305).  The period of review (POR) is August 25, 2021, through May 31, 2023.

**II.     Issue Presented for Review**

1.      Whether Commerce's selection of Egypt as the primary surrogate country pursuant to 19 U.S.C. §§ 1677b(c)(1) and (4) is supported by substantial evidence and is otherwise in accordance with law.

---

[1] "P.R." refers to documents from the public record index, and "C.R." refers to documents from the confidential record index submitted on September 24, 2025.  ECF No. 38.

2.       Whether Commerce's Determination That Egypt's Surrogate Data Is The Best Information On The Record To Value Respondents Factors Of Production Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law

**STATEMENT OF FACTS**

On August 3, 2023, Commerce initiated an administrative review of the antidumping duty order covering raw honey from Vietnam.  *See Initiation of Antidumping and Countervailing Duty Administrative Review,* 88 Fed. Reg. 51,271, 51,276 (Dep't of Commerce Aug. 3, 2023) *(Initiation Notice*) (P.R. 22).  Commerce selected Ban Me Thuot Honeybee JSC (BMT) and Daklak Honeybee Joint Stock Company (DakHoney) as mandatory respondents.  *See* Respondent Selection Memorandum (Oct. 5, 2023) (P.R. 61, C.R. 28).

**I.       Selection of the Primary Surrogate Country**

Because Vietnam is a non-market economy country, Commerce was required to select surrogate values from an economically comparable market economy to calculate normal value. *See* 19 U.S.C. § 1677b(c)(1).  To select a primary surrogate country, pursuant to 19 U.S.C. § 1677b(c)(4), Commerce compiled a non-exhaustive surrogate country list of market economies that are comparable to the non-market economy in question in terms of economic development. *See* Import Admin., U.S. Dep't of Commerce, *Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process* (2004), *http://enforcement.trade.gov/policy/bull04-1.html* (last visited May 18, 2026) (Policy Bulletin 04.1).

On January 25, 2024, Commerce released the non-exhaustive list of countries (Surrogate Country List) determined to be at the same level of economic development as Vietnam and invited interested parties to comment regarding the selection of a surrogate country and surrogate value (SV) data.  *See* Surrogate Comments Memorandum (Jan. 25, 2024) (P.R. 112).

3

The Surrogate Country List included six countries as comparable to Vietnam in terms of economic development based on 2022 per capita gross national income (GNI) data: Indonesia, Jordan, Egypt, Philippines, Morocco, and Sri Lanka.  *See* Surrogate Comments Memorandum at Attachment I (citing World Bank, *World Bank Development Indicators*, http://data.worldbank.org/indicator/NY.GNP.PCAP.CD (last visited May 19, 2026).  Commerce explained that per capita GNI is the "primary indicator of a country's level of economic development." *Id.*  The per capita GNI income levels of the list ranged from Sri Lanka's $3,610 to Indonesia's $4,580; Vietnam had a per capita GNI of $4,010 in 2022, while Egypt's was $4,100. *Id.*

Commerce received timely filed comments regarding surrogate country and SV data selection from the petitioners, the American Honey Producers Association and Sioux Honey Association, BMT, DakHoney, and the government of Vietnam (GOV).[2]  Additionally, petitioners and BMT addressed surrogate country and SV data selection in their pre-preliminary comments.  *See* Petitioners' June 10, 2024 Pre-Prelim Comments (June 10, 2024) (P.R. 236-37); *see also* Petitioners' June 13, 2024 Pre-Prelim Comments (June 13, 2024) (P.R. 239, C.R. 176); and BMT's Pre-Prelim Comments (June 10, 2024) (P.R. 238).

---

[2] *See* Petitioners' February 9, 2024 SC Comments (Feb. 9, 2024) (P.R. 128); *see also* Petitioners' February 16, 2024 SC Comments (Feb. 16, 2024) (P.R. 137); Petitioners' February 29, 2024 SC and SV Comments (Feb. 29, 2024) (P.R. 161-186); Petitioners' March 15, 2024 SC and SV Comments (Mar. 15, 2024) (P.R. 199);  Petitioners' May 29, 2024 SV Comments (May 29, 2024) (P.R. 217-25); BMT's February 9, 2024 SC Comments (Feb. 9, 2024) (P.R. 130-33); BMT's February 29, 2024 SV Comments (Feb. 29, 2024) (P.R. 146-51); BMT's May 29, 2024 SV Comments (May 29, 2024) (P.R. 215-16); BMT's June 10, 2024 SV Comments (June 10, 2024) (P.R. 231-35); DakHoney's February 9, 2024 SC Comments (Feb. 9, 2024) (P.R. 129); DakHoney's March 15, 2024 SC and SV Comments (Mar. 15, 2024) (P.R. 197-98); DakHoney's June 4, 2024 SV Comments (June 4, 2024) (P.R. 229-30); and the GOV's February 9, 2024 SC Comments (Feb. 9, 2024) (P.R. 119-26).

BMT and petitioners both proposed that Commerce should consider Ukraine as an alternative primary surrogate country, because it is a significant producer of comparable merchandise and had a per capita GNI of $4,270 in 2022, which is within the GNI range established by Commerce's list of potential surrogate countries (*i.e.,* between $3,610 and $4,580).  *See* Petitioners' February 9, 2024 SC Comments at 4-5 (P.R. 128); *see also* BMT's Pre-Prelim Comments at 3-4 (P.R. 238).  BMT further argued that Egypt was not a significant producer of comparable merchandise, that reliance on surrogate values from Egypt is problematic due to inflation, currency devaluation, and port restrictions in Egypt from 2022-2023, that Commerce should not rely on Egyptian financial statements for the purpose of calculating financial ratios, and that Commerce should select India as the primary surrogate country and Ukraine in the alternative.  *See* BMT's February 9, 2024 SC Comments at 3 (P.R. 130); *see also* BMT's June 10, 2024 SV Comments at 1-5 (P.R. 231); and BMT's Pre-Prelim Comments at 4-6 (P.R. 238).  DakHoney argued that Egypt was not a significant producer of comparable merchandise and that the Food and Agriculture Organization of the United Nations' (FAO) data on Egyptian producer prices for raw honey in 2019 should not be relied upon because they are much higher than the average export price of Egyptian raw honey in the UN's Comtrade data.  *See* DakHoney's February 9, 2024 SC Comments at 3-4 (P.R. 129); *see also* DakHoney's March 15, 2024 SC and SV Comments at 4-5 (P.R. 197).

Petitioners argued that Commerce should select Egypt as the primary surrogate country, that Commerce should not select an "off list" country as the primary surrogate country because respondents had failed to meet their burden of establishing that all of the countries on the list were not significant producers of comparable merchandise and/or that they did not provide useable or reliable surrogate value information, and that the high inflation experienced by Egypt

5

during the POR is not relevant to selection of a surrogate country.  *See* Petitioners' February 9, 2024 SC Comments at 4-5 (P.R. 128); *see also* Petitioners' February 16, 2024 SC Comments at 4 (P.R. 137); Petitioners' February 29, 2024 SC and SV Comments at 8; Petitioners' June 10, 2024 Pre-Prelim Comments at 16 (P.R 236); and Petitioners' June 13, 2024 Pre-Prelim Comments at 11-12 (P.R. 239).

## II.     The Preliminary Results

On June 28, 2024, Commerce published the preliminary results.  *See Raw Honey From the Socialist Republic of Vietnam: Preliminary Results of Antidumping Duty Administrative Review 2021-2023*, 89 Fed. Reg. 55,554 (Dep't of Commerce June 28, 2024) (*Preliminary Results*) (P.R. 249), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 242). Commerce preliminarily selected Egypt as the primary surrogate country for the administrative review.  Commerce determined that Egypt is at a level of economic development comparable to Vietnam, is a significant producer of comparable merchandise, and has publicly available data for all the mandatory respondents' identified inputs.  PDM at 15.  Commerce explained that unless none of the countries in the Surrogate Country List are significant producers of comparable merchandise, do not provide reliable sources of publicly available surrogate data, are unsuitable for use for other reasons, or unless "*Commerce finds* that another equally comparable country within the GNI range… is an appropriate surrogate, Commerce will rely on data from one of the Surrogate Comments Memorandum countries."  PDM at 12-13 (emphasis added). Commerce also noted that 19 U.S.C. § 1677b(c)(1) instructs Commerce to value the FOPs based upon "the best available information from a {market economy} country or countries that *Commerce considers appropriate.*"  *Id*. at 14 (emphasis added).

Commerce found that the record contains complete SV data for both Egypt and Ukraine—data that is publicly available, representative of broad market averages, and tax-and

duty-exclusive.  Commerce determined that Egypt was preferrable because it is on the Surrogate Country List and because Egypt's raw honey SV information was presented on a monthly basis rather than as an annual rate.  *Id.*

In accordance with its preference to value FOPs using a single surrogate country, 19 C.F.R. § 351.408(c)(2), Commerce based the SVs for BTM's direct and packing materials, labor, electricity, water, and truck freight expenses using Egyptian data.  *See id.* at 20-23; Preliminary SV Memorandum (July 2, 2024) (P.R. 246).[3]  Commerce separately noted its preference "to value labor solely based on data from the primary {surrogate country.}"  PDM at 21 (citing *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor,* 76 Fed. Reg. 36,092 (Dep't of Commerce, June 21, 2011)).  Because the record did not contain any other surrogate financial statements from other producers of identical or comparable merchandise, Commerce selected two surrogate financial statements of producers of identical merchandise from India.  *See id.* at 22-23.

On December 5, 2024, BMT and DakHoney submitted their administrative case briefs.  *See* BMT's Administrative Case Brief (Dec. 5, 2024) (P.R. 276-80, C.R. 254-58); DakHoney's Administrative Case Brief (Dec. 5, 2024) (P.R. 281-82).  BMT and DakHoney argued that Commerce should select Ukraine as the primary surrogate country because Ukraine is economically comparable to Vietnam and a significant producer of identical merchandise, and because its SV data is the best information on the record due to being more contemporaneous, reliable, and specific to the FOPs of this review.  *See* BMT's Administrative Case Brief at 6 (P.R. 276); *see also* DakHoney's Administrative Case Brief at 1 (P.R. 281).

---

[3]  Commerce identified the data sources it used to value the FOP and movement services reported by the respondents in the review in a separate memo to the file.  *See* SV Memo (June 28, 2024) (P.R. 246-48).

Specifically, BMT argued (1) that Ukrainian SV data for input raw honey comes from two sources rather than Egypt's single source; (2)  that Ukraine's raw honey SV data is contemporaneous with the first five months of the POR while Egypt's is from two years prior to the POR; (3) that Ukraine's electricity rates are specific to non-household consumers while Egypt's electricity rates do not distinguish between commercial use and household consumer use, making Ukraine's electricity rates more specific; (4) that Ukraine's water tariff rates are contemporaneous with the POR while Egypt's precede the POR by three years; (5) that Ukraine's water tariff rates are by region while Egypt's are for only two cities, making them less of a broad market average not specific to the regions where agricultural products are processed; and (6) that Ukraine's labor SV data is specific to the same type of industry as honey production, *i.e.*, food product processing, while Egypt's are for the broader category of plant and machine operators, and assemblers.  *See* BMT's Administrative Case Brief at 10-11, 22 (P.R. 276-77).

BMT and DakHoney further stated that Commerce's reasoning for selecting Egypt as the primary surrogate country was flawed because Commerce espoused a preference for countries on the Surrogate Country List, because Egypt is not a significant producer of comparable merchandise, and because Egypt experienced high inflation and had distorted exchange rates during the POR.  *See id.* at 13-18 (C.R. 254-55); *see also* DakHoney's Administrative Case Brief at 2-8 (P.R. 281).  The respondents also claimed that, because Egypt experienced high inflation driven by inflation in food prices during the POR, this food related inflation renders Egypt's raw honey SV data unreliable.  *See* BMT's Administrative Case Brief at 15-17 and Attachment C (P.R. 279-80); *see also* DakHoney's Administrative Case Brief at 7-8 (P.R. 281).  Both BMT and DakHoney argued that devaluation of the EGP[4]-USD exchange rate during the POR also

---

[4]  Egyptian Pound.

8

impacted the reliability of Egypt SV data.  BMT's Administrative Case Brief at 18 (P.R. 279);

DakHoney's Administrative Case Brief at 8 (P.R. 281).  BMT further claimed Egyptian

exchange rates declined by 49% over the course of the POR, resulting in the calculation of

distorted margins.  *See* BMT's Administrative Case Brief at 18 and Attachment 4 (C.R. 257)

(citing SV Memo at Attachment II (P.R. 248); BMT's June 10, 2024 SV Comments at Exhibit

3.1 (P.R. 235)).

BMT also argued that Egypt's SV data was flawed in several regards.  BMT argued that

Egypt's input raw honey SV data is unreliable because the weighted average export price of

finished honey was priced almost 30% lower than the input raw honey price.  BMT argued that,

contrary to Commerce's preliminary finding that Egypt's raw input honey data is more specific,

specificity refers to product specificity.  Thus, BMT argued, having non-contemporaneous

monthly data is not a factor that can be weighed in favor of Egypt.  *See id.* at 19-20 (P.R. 277)

(citing Petitioners' February 29, 2024 SC and SV Comments at Exhibit EGY-1A (P.R. 161);

DakHoney's March 15, 2024 SC and SV Comments at Exhibit 2 (P.R. 198)).

BMT claimed that Egypt's direct and packing materials SV data is unreliable because a

comparison between the two sources of Egypt's drum import data—Trade Data Monitor (TDM)

and Global Trade Atlas (GTA)— reveal missing import quantities in the GTA data.  *See id.* at 21

(citing SV Memo at Attachments I and II (P.R. 247-48); Petitioners' February 29, 2024 SC and

SV Comments at Exhibits EGY-1B, EGY-4, EGY-7 (P.R. 161, 165-66)).  Specifically, BMT

stated that missing import quantities for May 2023 cause a 206 percent higher average unit value

(AUV) when using GTA's import data than TDM's import data, rendering Egyptian import data

for drums unreliable.  *Id.*  BMT further claimed that the Egyptian AUV used in the preliminary

results was unusually high when compared with Ukraine's AUV, demonstrating the unreliability

9

of the GTA data.  For these reasons, BMT requested that Commerce use Ukraine's raw input honey and drums regardless of the primary surrogate country selected.  *Id.* at 26-29.

Finally, BMT argued that Commerce's calculated preliminary dumping margins were outliers driven by Commerce's surrogate country decision.  In support, BMT referred to the preliminary margins calculated in the administrative reviews covering raw honey from Argentina, Brazil, and India.  *See id.* at 24 (citing *Raw Honey From Argentina: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 55915 (Dep't of Commerce July 8, 2024); *Raw Honey From Brazil: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 55582 (Dep't of Commerce July 5, 2024); and *Raw Honey From India: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2021–2023*, 89 Fed. Reg. 56306 (Dep't of Commerce July 9, 2024)).

In their rebuttal brief, petitioners argued in support of Commerce's determination that Egypt is a significant producer of raw honey.  *See* Petitioners' Rebuttal Brief at 11-13 (Dec. 13, 2024) (P.R. 294, C.R. 262).  Petitioners argued that BMT's claim that inflation rose "130 percent from 2019 to the POR" was misleading.  *See id.* at 4, 15-16; *see also* Pl. Br. at 14 (citing SV Memo at Attachments I and II (P.R. 247-48); BMT's Administrative Case Brief at Attachment C (P.R. 280, C.R. 258)).  Petitioners observed that the increase from the CPI index value for 2019 of 288.57 to the POR's CPI index value of 374.89 represents only an inflation of 29.91%.  *Id.* at 15 (P.R. 294); *see also* SV Memo at Attachment II at CPI Inflator (P.R. 248).

Petitioners also challenged BMT's claim that a comparison of the dumping margins from the beginning of the POR to margins from the end of the POR demonstrates that BMT's overall dumping margins were distorted by a 49% decline in the Egyptian exchange rates during the

10

course of the POR.  *See* Petitioners' Rebuttal Brief at 5 (C.R. 262); *see also* Pl. Br. at 15-16 (citing BMT's Administrative Case Brief at 17 and Attachment C (P.R. 277-80, C.R. 254-58); Preliminary Analysis Memo at Attachment II (June 28, 2024) (P.R. 246-48); and BMT's June 10, 2024 SV Comments at Exhibit 3.2 (P.R. 235)).  Petitioners argued that the 49% change, which petitioners noted amounts to a change of 2.2% per month over the 22-month POR, is not the sole cause of differences between margins at the beginning and end of the POR.  Petitioners argued that BMT's analysis ignores [ ███████████████████████████████████ ███████████████████████████████ ].  *See* Petitioners Rebuttal Brief at 5, 16 (C.R. 262) (citing [ █████████████████████████████████████████ ██████ ]).

Petitioners argued that Egypt's SV labor data is not overly broad.  BMT and DakHoney's factory workers are plant and machinery operators, and that specificity to the type of labor undertaken, *i.e.*, equipment operation, better represents BMT's costs than the broad category of food processing.  *See id.* at 35-37 (citing BMT's Section C and D Questionnaire Response at 5 and Exhibit D-4 (P.R. 97, C.R. 64-71); DakHoney's Section D Questionnaire Response at 9-10 (P.R. 98, C.R. 72-85)).  Finally, petitioners argued that the Russian invasion of Ukraine caused significant distortions to labor, energy, transportation costs, and the overall costs of production, rendering the use of any Ukrainian SV data less accurate and reliable than Egyptian SV data. *See id.* at 2, 23-27, 29-30, 34, 37, 41 (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibit UKR-6 (P.R. 171-84)).

## III.    The Final Results

On April 7, 2025, Commerce published its final results.  Commerce continued to find that Egypt is a significant producer of comparable merchandise.  Commerce explained that the term "significant producer" is not statutorily defined and that legislative history suggests that

Commerce may consider a "net exporter" of identical or comparable merchandise, which Egypt is, to be a significant producer. *See* IDM at 14-15 (citing Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Rep. No. 100-576, at 590, reprinted at 1988 U.S.C.C.A.N. 1547, 1623 (1988)). Commerce also continued to select Egypt as the primary surrogate country, finding that its publicly available data constitute the best available information. *See id.* at 19.

Commerce found that the majority of the SV data from both Egypt and Ukraine are contemporaneous, representative of broad market averages, tax and duty-exclusive, and publicly available. Commerce also found that certain SV data for both countries were not contemporaneous: "raw honey, water, brokerage and handling and truck freight for Egypt, and labor, electricity, brokerage and handling and truck freight for Ukraine." *Id.* at 21 (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibits EGY-1A, EGY-3B, EGY-5, UKR-2, UKR-3A, and UKR-5 (P.R. 161, 166-71)). Commerce found that Egypt's SV data for electricity to be specific because the data are itemized by voltage levels and purpose of usage. *Id.* (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibit EGY-3B (P.R. 161). Commerce also found that the Egyptian SV data for labor are applicable to BMT and DakHoney's plant and factory workers, and that Egyptian SV data for water constitute a broad market average because the data reflect two major cities. *Id.* (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibits EGY-2 and EGY-3A (P.R. 161)).

Commerce found that there was not enough information on the record to conclude why the average 2019 export price of finished packed honey from Egypt is lower than the 2019 producer price of raw honey from Egypt. *Id.* Commerce determined that it is reasonable to assume that the two sets of data are not comparing the same subclassification of honey. *Id.*

Commerce also determined that the difference between prices could be attributed to the fact that the two datasets come from different sources (the FAO and UN Comtrade) and that the FAO's value is calculated based on a simple average, while the UN Comtrade value is calculated based on a weighted average. *Id.* (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibit EGY-1A ((P.R. 161). Commerce did not find that this difference in prices rendered the Egyptian SV data for raw honey unreliable.

Commerce also determined that allegations of high inflation in Egypt during the POR did not render Egypt's SV data unreliable such that Commerce could not use it as a primary surrogate country. *See id.* at 21-22. Commerce noted that it had not made a formal determination of high inflation in Egypt in this proceeding. Even when Commerce has made a determination of hyperinflation in a country, such as in Türkiye during portions of 2019, Commerce still found the country's SV data reliable for the purpose of selection as a primary surrogate country. *Id.* (citing *Certain Metal Lockers and Parts Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 35,737 (Dep't of Commerce July 7, 2021) (*Certain Metal Lockers from China*), and accompanying IDM at 16-18). Commerce explained that hyperinflation is not a criterion for surrogate country selection and so Commerce's use of the hyperinflationary methodology[5] does not undermine the prices or costs recorded in a respondent's books and records. *Id.* at 22 (citing *Certain Metal Lockers from China* IDM at 16-18). Commerce then determined that exchange

---

[5] Commerce's methodology for high inflation requires respondents to report monthly replacement costs for direct materials and monthly averages for conversion costs. The monthly costs are then indexed to the end of the POR to calculate a constant currency annual weighted average cost of production (COP) that is then restated to the equivalent amount in the respective POR months.

13

rate devaluation similarly is not a basis or criterion for surrogate country selection and so does not preclude Commerce from continuing to select Egypt as the primary SC. *Id.*

Commerce stated that petitioners' arguments on the effects of Russia's invasion of Ukraine contributed to its decision to not consider Ukraine as the primary surrogate country, as Commerce found that Kernal Holding S.A.'s (Kernal) annual report for the fiscal year ending in June 30, 2023 indicates that the conflict has distorted operational costs in Ukraine. *Id.*; *see also* Petitioners' February 29, 2024 SC and SV Comments at Exhibit UKR-6 (P.R. 171-84)). Specifically, Commerce found Kernal's experience of needing to "set aside its growth strategy and operate in survival mode" to be reasonably indicative of the disruption and instability experienced by other businesses located in Ukraine, and that the war impacted all aspects of business operations in Ukraine, including logistics, energy, and labor. *See* IDM at 22 (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibit UKR-6 at Chairman's Statement, "Our Strategy 2026," and Financial Performance in FY2023 (P.R. 171)). Based upon Kernal's position in the agricultural sector, Commerce found it reasonable to conclude that the honey industry in Ukraine would be similarly impacted by Russia's invasion. *Id.* at 23. Accordingly, Commerce found that Ukrainian SV data for raw honey prices, transportation, energy, and labor to be unreliable or unsuitable for use. *Id.* Commerce found this consideration weighed heavily against concluding that Ukraine offered the best available information for valuing respondents' FOPs. *Id.*

Finally, Commerce declined to use Ukrainian SVs for raw honey or drums, regardless of Commerce's selection of Egypt as the primary surrogate country, because Commerce found that Egypt's raw honey and drum SV data were not unreliable or unsuitable for use. *Id*. at 24-25. Commerce found that while Egypt's SV data for raw honey is not contemporaneous with the

POR, the data was not so outdated as to be unsuitable.  IDM at 24.  Commerce explained that a lack of contemporaneity for certain SV data will not disqualify a country from use as a primary surrogate country when all its other characteristics make it suitable for use.  *Id*. (citing Certain Aluminum Foil From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 83 Fed. Reg, 9,282 (March 5, 2018) (Certain Aluminum Foil from China), and accompanying IDM at 12 (finding it reasonable to inflate SV data from the primary surrogate country from four years prior to the POI rather than use contemporaneous SV data from a second country)).  Consistent with its practice, Commerce adjusted the raw honey and drum SV data for inflation.

Commerce also disagreed with BMT's claim that Egypt's SV data used to value drums are unreliable due to the selected GTA import data missing import quantities.  *See id.* at 25-26. Commerce noted that it has used GTA data in many NME proceedings and that it is not unreasonable for one data source to have information not found in another data source.  *Id.* at 26. Closely examining the May 2023 TDM Egypt import data for drums, Commerce found that every country is reported to have traded drums at a "one-to-one ratio between quantities and values."  *See id.* at 26 (citing Petitioners' June 10, 2024 Pre-Prelim Comments at Egypt Surrogate Value Data (P.R. 237)).  Commerce found that this fact calls into question the reliability of TDM's data for May 2023 and explains the "alleged anomaly" identified by BMT. *See* IDM at 26.  Commerce then found that inaccuracies in TDM's import data do not impugn the reliability of GTA's import data, which is the dataset Commerce used in the final results.  *Id*. After considering party arguments, Commerce determined to continue to use Egypt to value all SVs other than surrogate financial ratios.  *Id.*

15

Commerce calculated a dumping rate of 100.72% for BMT, 156.96% for DakHoney, and a rate of 121.97% for all non-individually examined separate rate respondents. *Final Results*, 90 Fed. Reg. at 15,554.

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's final results. First, Commerce reasonably selected Egypt as the primary surrogate country. Egypt is economically comparable to Vietnam, a significant producer of comparable merchandise, and the record contains complete SV data for Egypt that is publicly available, representative of broad market averages, and tax-and-duty-exclusive. While Ukraine is also economically comparable to Vietnam, a significant producer of comparable merchandise, and has complete SV data, neither Egypt nor Ukraine are perfect sources of data. It is within Commerce's purview to decide which imperfect source of data to use. Furthermore, while Commerce must value the factors of production on the basis of "the best available information" regarding the value, does not mandate a particular procedure or methodology for Commerce to employ in making this determination, and so Commerce may perform its duties in the way it believes most suitable. Commerce thus has substantial discretion to determine that Egypt has the best available information on the record, and accordingly select it as the primary surrogate country.

Second, Commerce normally values all factors of production in a single surrogate country; Commerce's practice is to only use data from a secondary surrogate country when data from the primary surrogate country are unavailable or unreliable. Thus, Commerce selected Egypt's surrogate values as the best available information to value the factors of production.

16

**ARGUMENT**

## I.    Standard Of Review

The Court sustains any determination, finding, or conclusion by Commerce unless it is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. §

1516a(b)(1)(B)).

"The specific factual findings on which {Commerce} relies in applying its interpretation

are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555

U.S. 305, 316 n.6 (2009).  Substantial evidence is "'more than a mere scintilla' and 'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking

into account the entire record, including whatever fairly detracts from the substantiality of the

evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Substantial

evidence may be "less than the weight of the evidence," and the possibility of drawing

inconsistent conclusions from the record does not render findings unsupported by substantial

evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  A party challenging

Commerce's determination under the substantial evidence standard "has chosen a course with a

high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir.

2006) (citation omitted).

## II.    Legal Framework For Surrogate Value Selections

An antidumping duty represents the amount by which the "normal value" of subject

merchandise exceeds its "export price (or the constructed export price)."  19 U.S.C. § 1673.  In

proceedings involving a non-market economy, such as Vietnam, Commerce determines the

subject merchandise's normal value by relying on the "best available information" from a market

17

economy country or countries that Commerce considers appropriate to derive surrogate

valuations for the respondents' factors of production, including raw materials, labor, and utilities.

*See* 19 U.S.C. § 1677b(c).  To those factors, Commerce also adds "an amount for general

expenses and profit plus the cost of containers, coverings, and other expenses."  *Id.*

Commerce must use, "to the extent possible," surrogate factors from "one or more market

economy countries that are — {(1)} at a level of economic development comparable to that of

the nonmarket economy country, and {(2)} significant producers of comparable merchandise."

19 U.S.C. § 1677b(c)(4)(A)-(B).  If more than one market economy country is economically

comparable and a significant producer of comparable merchandise, then Commerce evaluates

and compares the reliability and completeness of the record data from those countries.  *See*

Policy Bulletin 04.1.

By statute, Commerce must select the "best available information" on the record to value

the factors of production.  *See Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289,

1294 (Fed. Cir. 2016) (citing 19 U.S.C. § 1677b(c)(1)(B)).  Commerce possesses "broad

discretion" to determine what record evidence constitutes the "best available information."

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011)

(citations omitted); *see also Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed.

Cir. 1999); *Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd. v. United States*, 794 F.

Supp. 3d 1334, 1341-42 (Ct. Int'l Trade 2025) (holding that Commerce retains deference in its

determination of best available information following *Loper Bright*).

In practice, Commerce strives to select, to the extent practicable, surrogate values that are

product-specific, representative of a broad market average, publicly available, contemporaneous

with the period of review, and tax and duty-exclusive.  *See, e.g., Certain Frozen Fish Fillets*

18

*from the Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 Fed. Reg. 11,349 (Mar. 17, 2009), and accompanying IDM at Comment 2; *see also Jiaxing Bro.*, 822 F.3d at 1293.  There is no hierarchy among these criteria, and it is Commerce's practice to carefully consider the available evidence in light of particular facts of each industry when undertaking its analysis.  *See, e.g., Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review,* 71 Fed. Reg. 40,477 (July 17, 2006), and accompanying IDM at Comment 1.

Commerce has a regulatory preference to use as much data as possible from a single primary surrogate country.  *See* 19 C.F.R. § 351.408(c)(2); *Jiaxing Bro.*, 822 F.3d at 1294, 1294 n.3 (citing Policy Bulletin 04.1).  Commerce also has a long-standing practice that it will "*only resort* to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable." *Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 132–33 (Ct. Int'l Trade 2014) (citations omitted), *aff'd*, *Jiaxing Bro.*, 822 F.3d 1289.

Commerce may rely on "imperfect" data.  *Jiaxing Bro.*, 822 F.3d at 1301 (citing *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)).  Furthermore, Commerce is not required to duplicate the precise experience of the manufacturer in the non-market economy.  *Nation Ford*, 166 F.3d at 1377.  Instead, Commerce seeks to identify and to rely on the record data that "most accurately represents the fair market value" of the relevant factor of production.  *Id.*

Accordingly, given Commerce's discretion to determine the "best available information," and the fact-specific nature of this inquiry, the Court considers "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that

19

Commerce chose the best available information." *Jiaxing Bro.*, 822 F.3d at 1301 (citing *Zhejiang*, 652 F.3d at 1341).

**III.    Commerce's Selection Of Egypt As The Primary Surrogate Country Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law**

Commerce's selection of Egypt as the primary surrogate country is supported by substantial evidence and is otherwise in accordance with law.  Congress delegated to Commerce the selection of a primary surrogate country and its resulting data.  *See QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1320 (Fed. Cir. 2011) ("Because it is not always possible to determine the normal value of goods from nonmarket economy countries in the manner outlined in 19 U.S.C. § 1677b(a)(1), Congress allows Commerce to value the factors of production for such goods by looking to the best available information from appropriate market economy countries, referred to as 'surrogate countries.'"  (citations omitted)); *see also* 19 U.S.C. § 1677b(c)(1) (*"the administering authority shall determine the normal value of the subject merchandise"*).

Beyond requiring, to the extent possible, that the surrogate country or countries Commerce selects be economically comparable and a significant producer of comparable merchandise, the statute is silent with respect to how Commerce should determine which countries are appropriate for selection as surrogates, economically comparable, or significant producers of comparable merchandise.  When Congress does not mandate a procedure or methodology for applying a statutory test, "Commerce may perform its duties in the way it believes most suitable." *Jiaxing Bro.*, 822 F.3d at 1298 (citing *JBF RAK LLC v. United States*, 790 F.3d 1358, 1364 (Fed. Cir. 2015)); *see also Nation Ford Chem. Co. v. United States,* 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("{w}hile § 1677b(c) provides guidelines to assist Commerce

20

in this process, this section also accords Commerce wide discretion… in the application of those guidelines").

In this review, Commerce found Egypt to be the only country on its Surrogate Country List at a level of economic development comparable to Vietnam and a significant producer of comparable merchandise. *See* PDM at 15 (P.R. 242); *see also* IDM at 19-20.[6]  Although not on the Surrogate Country List, Commerce found that record information indicates that Ukraine, too, is economically comparable to Vietnam and a significant producer of comparable merchandise. IDM at 20.  While Plaintiffs claim, without citing any supporting legal authority, that the extent of production in a country is relevant to evaluating the robustness and quality of the data from said country, Policy Bulletin 4.01 specifically notes that a country which "perfectly meets the requirements of… significant producer" may still have inadequate factor price data.  *See* Pl. Br. at 7; *see also* Policy Bulletin 4.01.  Accordingly, Commerce did not take this factor into consideration in its evaluation of the availability and reliability of SV data.  IDM at 20-21 ("{w}hen evaluating SV data, Commerce considers several factors, including whether the SVs are: (1) publicly available; (2) contemporaneous with the POR; (3) representative of a broad market average; (4) tax and duty exclusive; and (5) specific to the inputs being valued").

Commerce's selection of Egypt as the primary surrogate country is supported by substantial evidence and in accordance with the law.  Both Egypt and Ukraine offered SV data that was deficient for certain FOPs.  Specifically, the Egyptian SV data for raw honey, water, brokerage and handling, and truck freight are not contemporaneous, while the Ukrainian SV data for electricity, brokerage and handling, and truck freight are not contemporaneous.  IDM at 21

_____

[6]  Plaintiffs do not dispute that Egypt is economically comparable and a significant producer of comparable merchandise.

21

(citing Petitioners' February 29, 2024 SC and SV Comments at Exhibits EGY-1A, EGY-3B, EGY-5, UKR-2, UKR-3A, and UKR-5 (P.R. 161, 166-71)). When "Commerce is faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information." *Dorbest Ltd. v. United States*, 30 C.I.T. 1671, 1687, 462 F. Supp. 2d 1262, 1277 (Ct. Int'l Trade 2006).

Plaintiffs assert that where a single factor of production (in this case, raw honey) comprises the majority of the cost of manufacture, Commerce's approach is to select the primary surrogate country based on which country offers the best information for this single factor. Pl. Br. at 8 (citing *Jiaxing Bro.*, 822 F.3d at 1301; *Drawn Stainless Steel Sinks From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 76,174 (Nov 6, 2023), accompanying Issues and Decision Memorandum, Comment 2)). Because Egypt's raw honey SV data is not contemporaneous, plaintiffs argue that Commerce's selection of Egypt as the primary surrogate country cannot be sustained.

Commerce's selections in other cases, however, do not restrain its discretion to determine which potential surrogate country has the best information on this record. *See Jiaxing Bro.*, 822 F.3d at 1299 ("{e}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record") (citing *Qingdao Sea–Line Trading Co. v. United States,* 766 F.3d 1378, 1386 (Fed. Cir. 2014); *see also Baoding Yude Chem. Indus. Co., Ltd. v. United States,* 25 C.I.T. 1118, 170 F.Supp.2d 1335, 1343 (Ct. Int'l Trade 2001) ("{t}here are no set rules for determining best available information; rather, Commerce makes the decision on a case-by-case basis"). Here, Commerce recognized that Egypt's raw honey data is not contemporaneous and determined that this did not disqualify

Egypt from use as a surrogate country because "all its other characteristics make it suitable for use."  IDM at 24 (citing *Certain Aluminum Foil from China* IDM at 12).

Plaintiffs challenge, as unsupported by the record, Commerce's finding that the Russian invasion of Ukraine impacted the honey industry in Ukraine "such that Ukrainian raw honey prices would not be suitable as an SV."  Pl. Br. at 12.  Ukraine's raw honey SV data is from 2021, while Russia's invasion did not occur until February 2022.  Plaintiffs also claim that this is Commerce's "sole rationale" for disfavoring Ukrainian raw honey SV data.  This claim is inaccurate regardless of whether Russia's invasion impacted Ukrainian honey prices in 2021, however.  Commerce has a regulatory preference to "value all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2).  Deriving surrogate value data from one country limits the amount of distortion introduced into Commerce's calculation.  *Clearon*, 37 C.I.T. at 229.  This Court has previously held that Commerce's single surrogate country preference must be "treat{ed} seriously" and given significant weight.  *See Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1376-77 (Ct. Int'l Trade 2014), aff'd 619 Fed. Appx. 992 (Fed. Cir. 2015), (quoting *Clearon Corp. v. United States*, 37 C.I.T. 220, 228 (2013)).

Plaintiffs assert that, had Commerce reasonably considered Ukraine's raw honey SV data that "this factor alone should have caused Commerce to select Ukraine" as the primary surrogate country.  Pl. Br. at 17.  In fact, Commerce considered Ukraine's raw honey SV data in its preliminary results, before it had found that the Russian invasion of Ukraine had impacted business operations in Ukraine and still selected Egypt as the primary surrogate country.  PDM at 15.

Because Commerce did not find that Egypt's SV data were unreliable or unsuitable for use, it was left with a choice between two imperfect options.  When presented with two sets of

facts and the "totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder ... to decide which side's evidence to believe." *Nippon Steel,* 458 F.3d at 1359. Disagreement as to whether Egypt or Ukraine's SV data constituted the best information on the record is insufficient to overturn Commerce's determination, which must be upheld unless no "reasonable mind could conclude that Commerce chose the best available information." *Jiaxing Bro.*, 822 F.3d at 1301 (citing *Zhejiang*, 652 F.3d at 1341). Plaintiffs cannot make that showing. Because Commerce's selection of Egypt as the primary surrogate country is supported by substantial evidence and in accordance with law, it must be sustained.

**IV.     Commerce's Determination That Egypt's Surrogate Data Is The Best Information On The Record To Value Respondents Factors Of Production Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law**

Plaintiffs claim that Commerce ignored flaws in Egypt's SV data and that Ukraine offered superior SV data for honey, drums, electricity, and water. Commerce addressed these alleged flaws with the raw honey and drum data, however, and nonetheless determined that Egyptian SV data remained the best available information on the record. IDM at 21, 25-26. Ukraine's quantity and value sold data are not contemporaneous with the POR, while Ukraine's import data for drums and other direct materials and packing FOPs are contemporaneous with the POR during the period where Commerce found that all aspects of business operations in Ukraine had been impacted by the Russian invasion. *See* BMT's May 29, 2024 SV Comments at Exhibit SV-3 (P.R. 215); *see also* Petitioners' February 29, 2024 SC and SV Comments at Exhibits UKR-1B, UKR-4, UKR-6, and UKR-7 (P.R. 166, 170-71, 184-85); and IDM at 22. Ukraine's electricity surrogate data is not contemporaneous with the POR, and Commerce has discretion to determine that Egyptian SV data for labor, electricity, and water were specific and representative of a broad market average. IDM at 21; *see also Jiaxing Bro.*, 822 F.3d at 1293.

Furthermore, Commerce has a regulatory preference to "value all factors in a single surrogate country."  IDM at 29 (citing 19 C.F.R. § 351.408(c)(2); *Jiaxing Bro.*, 961 F. Supp. 2d at 1335). Plaintiffs have failed to demonstrate that Egypt does not meet the statutory requirements set forth in 19 U.S.C. § 1677b(c)(4) , but rather "merely disagree with the evidentiary weight Commerce assigned" the SV data on the record.  *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1318, 1325 (Ct. Int'l Trade 2019) (*Jacobi 2019*).  Accordingly, Commerce's determination that Egypt's SV data is the best information on the record for the purpose of valuing FOPs is supported by substantial evidence and is in accordance with law.

### A.    The Egyptian SV data for raw honey is reliable and suitable for use

Plaintiffs argue that Egyptian SV data for raw honey are unreliable and cannot be used because the FAO data on Egyptian producer prices for raw honey was higher than the average export price of Egyptian raw honey in the UN's Comtrade data, the FAO data represented simple averages rather than weighted averages, the FAO data was non-contemporaneous, and high inflation and currency devaluation during the POR distorted Egyptian honey prices.  Pl. Br. at 9-11, 13-17.  Commerce considered all these factors in turn, however, and concluded that Egypt's SV data for raw honey is suitable for use.  IDM at 21, 24.  As explained above, Commerce found it reasonable to assume that the FAO and UN Comtrade data did not compare the same subclassifications of honey and that this factor, in addition to the fact that the data comes from different sources and are calculated using different averages, contributed to the average 2019 export price of finished packed honey from Egypt being lower than the 2019 producer price from Egypt of raw honey.  *See id.* at 21.

In their administrative case briefs, plaintiffs did not raise arguments regarding whether the FAO data is representative of a broad market average.  Thus, during the review, plaintiffs failed to present the argument that they now raise before this Court.  Plaintiffs cannot now seek

25

remand on the basis of an argument that they failed to raise before the agency.  *Corus Staal BV v. United States Steel Corp.*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Congress mandated that the Court of International Trade "{s}hall, where appropriate, require the exhaustion of administrative remedies" in civil actions arising from Commerce's antidumping duty determinations.  28 U.S.C. § 2637(d).  The statute reflects "a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."  *Corus Staal BV v. United States Steel Corp.*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).  Exhaustion is "a requirement explicitly imposed by the agency as a prerequisite for judicial review."  *Id.* at 1379.  This Court "generally takes a strict view of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases."  *Id.*

There are limited exceptions to the exhaustion requirement: "(1) plaintiff's argument involves a pure question of law; (2) there is a lack of timely access to the confidential record; (3) a judicial decision rendered subsequent to the administrative determination materially affected the issue; or (4) raising the issue at the administrative level would have been futile."  *Ninestar Corp v. United States*, 687 F. Supp. 3d 1308, 1326 (Ct. Int'l Trade 2024) (quoting *Gerber Food (Yunnan) Co. v. United States*, 601 F.Supp.2d 1370, 1377 (Ct. Int'l Trade 2009)); *see also Corus Staal, 502 F.3d* at 1378, fn. 4; *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384-85 (Fed. Cir. 2008).  None of them apply here.

The issue of whether certain data constitutes the best information on the record is an inherently fact-specific inquiry, rather than a pure question of law.  *See Baoding*, 170 F. Supp. 2d at 1343 ("there are no set rules for determining best available information; rather, Commerce

26

makes the decision on a case-by-case basis").  Determining whether Egypt's SV data for raw honey was representative of broad market averages requires consideration of the factual record.

Plaintiffs have made no showing that making this argument would have been futile.  The futility exception is "narrow," requiring a party to show that they "would be required to go through obviously useless motions in order to preserve their rights."  *Corus Staal*, 502 F.3d at 1379 (citations omitted).  While Commerce preliminarily determined that Egypt's SV data is representative of broad market averages, preliminary results "are 'preliminary' precisely because they are subject to change."  *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995); *see also* PDM at 15.  A party's administrative case brief "must present all arguments that continue in the submitter's view to be relevant to the… final results."  19 C.F.R. § 351.309(c)(2).

Lastly, Plaintiffs do not contend that there was any delay in accessing the confidential record nor any judicial decision issued between the final results and their brief to this Court which would materially affect the decision.  Thus, no exception to the exhaustion requirement applies and this Court should decline to entertain plaintiffs' argument regarding whether Egyptian SV data for raw honey are representative of broad market averages.

Plaintiffs' argument that high inflation and currency devaluation in Egypt during the POR rendered its SV data unreliable is also unavailing.  *See* Pl. Br. at 13-17.  Plaintiffs argue that Commerce did not "adequately address these problems with the Egyptian data."  Pl. Br. at 14.  In fact, Commerce stated that it had not made a finding that Egypt has high inflation for purposes of surrogate country selection, and that, regardless, hyperinflation is not a basis or criterion for surrogate country selection.  IDM at 22 (citing *Certain Metal Lockers from China* IDM at 16-18) (P.R. 305).  Commerce explained that this is because when Commerce applies its hyperinflation methodology, it accounts for rapid changes in price levels of material costs by determining

27

normal value on a monthly, quarterly, or annual basis rather than a POR-wide basis.  IDM at 22.  Even if Commerce had made a finding of hyperinflation, Commerce's hyperinflationary methodology would not change or undermine the underlying prices or costs in a respondent's books, records, or in its financial statements.  *Id.* (citing *Certain Metal Lockers from China* IDM at 16-18).  Commerce also stated that exchange rate devaluation does not preclude its selection of Egyptian surrogate values, "in the same manner that hyperinflation is not a basis or criterion for surrogate country selection."  IDM at 22.

Although Commerce did not directly respond to BMT's claims that the SV for Egyptian raw honey was inflated by 130 percent and that the only reason why normal values would change over the course of the POR is due to a change in exchange rate, Commerce "need not address every piece of evidence presented by the parties; absent a showing to the contrary, the court presumes that {Commerce} has considered all of the record evidence."  *Siemens Energy, Inc. v. United States*, 38 C.I.T. 879, 885, 992 F. Supp. 2d 1315, 1324 (Ct. Int'l Trade 2014), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015).[7]

As noted above, the increase of the CPI index value for 2019 of 288.57 to the POR's CPI index value of 374.89 represents only an inflation of 29.91%.  Petitioners' Rebuttal Brief at 15 (P.R. 294); *see also* SV Memo at Attachment II at CPI Inflator (P.R. 248); and IDM at 18.  Petitioners also argued that the 49% change in Egyptian exchange rates during the POR, which petitioners note only amounts to a change of 2.2% per month over the 22-month POR, is not the sole cause of differences between margins at the beginning and end of the POR, and that BMT's analysis ignores [ ████████████████████████████████████████████████

---

[7] Petitioners responded to both points in their rebuttal brief.  See BMT's Administrative Case Brief at 16-17 (C.R. 255); see also Petitioner's Rebuttal Brief at 4, 15-16 (C.R. 262).

██████████████████ ].  *See* Petitioners Rebuttal Brief at 5, 16 (C.R. 262) (citing [ ██████████

██████████████████████████████████████ ]).  While plaintiffs

assert that Egypt's inflation and currency devaluation distorted the normal value used in

Commerce's calculated results, inherent in Commerce's discretion to choose the best information

available is Commerce's ability to find that inflation and currency devaluation did not distort

domestic prices in Egypt.  *See* Pl. Br. at 14-16; *see also Baoding*, 170 F. Supp. 2d at 1343

(finding that Commerce has discretion to decide that a 30 percent tariff does not distort domestic

prices, and that "{t}his type of line-drawing exercise is precisely the type of discretion left

within the agency's domain").  Accordingly, Plaintiffs "merely disagree with Commerce's

conclusion." *See Jacobi 2019*, 422 F. Supp. 3d at 1327.  Indeed, this Court has sustained

Commerce's finding that an inflationary environment in a country does not preclude Commerce

from selecting SVs from said country, so long as the requirements of 19 U.S.C. § 1677b(c)(4) are

met.  *See Tianjin Magnesium Int'l Co., Ltd. v. United States*, No. 25-00002, 2026 WL 711052, at

*10 (Ct. Int'l Trade Mar. 13, 2026).

Finally, as discussed above, plaintiffs inaccurately claim that Commerce's "sole rationale

for disregarding the Ukrainian" honey prices is because of Russia's invasion of Ukraine.  *See* Pl.

Br. at 16.  Commerce reasonably determined that Egypt has the best SV information on the

record and continued to select it as the primary surrogate country in the final results and

Commerce has a regulatory preference to "value all factors in a single surrogate country."  IDM

at 29 (citing 19 C.F.R. § 351.408(c)(2); *Jiaxing Bro.*, 961 F. Supp. 2d at 1335).  Commerce's

single surrogate country preference must be "treat{ed} seriously" and given significant weight.

*See Jacobi 2014*, 992 F. Supp. 2d at 1376-77 (quoting *Clearon*, 37 C.I.T. at 228).  Commerce

has previously explained that this is because deriving SV data from one county limits the amount

29

of distortion introduced into Commerce's calculation. *See Clearon*, 37 C.I.T. at 229. While

plaintiffs argue that use of non-contemporaneous SV data for raw honey distorted the calculated

results, "there is no requirement that the data be perfect." *Home Meridian,* 772 F.3d at 1296; *see

also* Pl. Br. at 14. Commerce acknowledged that Egypt's raw honey SV data is not

contemporaneous with the POR and determined that this fact did not disqualify Egypt from use

as a surrogate country as "all its other characteristics make it suitable for use." IDM at 24 (citing

*Certain Aluminum Foil from China* IDM at 12). Commerce also noted that it has frequently

adjusted non-contemporaneous SV data to account for inflation. *Id.* While plaintiffs may

disagree that Egypt's SV data for raw honey constituted the best information on the record,

Commerce's determination must be upheld unless no "reasonable mind could conclude that

Commerce chose the best available information." *Jiaxing Bro.*, 822 F.3d at 1301 (citing

*Zhejiang*, 652 F.3d at 1341). Thus, this Court should sustain Commerce's determination that

Egypt's SV data for raw honey constitute the best available information on the record as

supported by substantial evidence and in accordance with law.

### B.  The Egyptian SV data for other direct materials and packing materials is the best information on the record

Plaintiffs argue, without support, that Commerce could not have reasonably concluded

that Egyptian SV data for other direct materials and packing materials, including drums, was the

best information on the record because it is unreliable. Pl. Br. at 17-18. Plaintiffs specifically

argue that the GTA import data used by Commerce has missing import quantities for May 2023

and that this significantly skewed the AUV for drums used by Commerce in its final results. *Id.*

at 18 (citing SV Memo at Attachments I and II (P.R. 247-48); Petitioners' February 29, 2024 SC

and SV Comments at Exhibits EGY-1B, EGY-4, EGY-7 (P.R. 161, 165-66)). Commerce

considered this "alleged anomaly" in Egypt's drum SV data, however, and found it did not

30

impugn its reliability.  IDM at 25-26.  Commerce examined the May 2023 TDM Egypt import data for drums proposed by plaintiffs and found that every country is reported to have traded drums at a "one-to-one ratio between quantities and values."  *See id.* at 26 (citing Petitioners' June 10, 2024 Pre-Prelim Comments at Egypt Surrogate Value Data (P.R. 237)).  For example, both datasets report that Egypt imported around $400,000 of drums from Italy in May 2023, but TDM's data reports that Egypt also imported around 400,000 kilograms of drums as well, leading to an AUV of 1.001 USD/kg.  *See* BMT's Administrative Case Brief at Attachment D (P.R. 280).  In comparison, both datasets also report that Egypt imported around $80,000 of drums from Italy in May 2022, but rather than reporting an importation of 80,000 kilograms of drums, both datasets report that Egypt imported 639.32 kilograms, leading to an AUV of 123.66 USD/kg.  *Id.*  Commerce found that this fact calls into question the reliability of TDM's data for May 2023 and explains the "alleged anomaly" identified by BMT.  IDM at 26.  Commerce then found that inaccuracies in TDM's import data do not impugn the reliability of GTA's import data, which is the dataset Commerce used in the final results.

Commerce also noted that it has used GTA data in many NME proceedings and that it is not unreasonable for one data source to have information not found in another data source.  *Id.* at 26 (citing *Stainless Steel Pipes from Vietnam*; *Low Speed Vehicles from China*; and *Paper Plates from Vietnam*).  Plaintiffs fail to demonstrate that Commerce's selection was not supported by substantial evidence, but instead "merely disagree with Commerce's conclusion."  *Jacobi 2019*, 422 F. Supp. 3d at 1327.

Plaintiffs also assert that Commerce could not have reasonably concluded that Egyptian data for drums was of better quality than the Ukrainian data.  Pl. Br. at 18.  Commerce reasonably explained its selection: while Ukraine's import data for drums are contemporaneous

31

with the POR, Ukraine's quantity and value sold data are not contemporaneous with the POR, and Commerce found that the Russian invasion impacted the honey industry in Ukraine and distorted operational costs.  IDM at 22-23; *See* BMT's May 29, 2024 SV Comments at Exhibit SV-3 (P.R. 215); *see also* Petitioners' February 29, 2024 SC and SV Comments at Exhibits UKR-1B, UKR-4, UKR-6, and UKR-7 (P.R. 166, 170-71, 184-85).  Specifically, Commerce found that the Russian invasion impacted all aspects of business operations in Ukraine and that the closure of ports resulted in "'skyrocketing' logistics costs."  IDM at 22 (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibit UKR-6 at Chairman's Statement (P.R. 171)).  Additionally, use of the Egyptian SV data for drums is consistent with Commerce's regulatory preference to value all factors in a single surrogate country.  Thus, Commerce conclusion that Egypt's drum SV data constitutes the best information on the record is supported by substantial evidence and is in accordance with law.

### C.    The Egyptian SV data for electricity, labor, water, and truck freight and brokerage are the best information on the record

Plaintiffs offer a variety of arguments asserting that Ukrainian SV data for electricity, labor, and water are superior to Egyptian SV data for the same FOPs, and that thus Commerce's surrogate country selection is unsupported by substantial evidence.  Pl. Br. at 19-22.  At best, plaintiffs have identified another way to read the record; but "even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent {Commerce's} determination from being supported by substantial evidence."  *Nippon Steel*, 458 F.3d at 1358 (quoting *Am. Silicon Techs. V. United States*, 261 F.3d 171, 176 (Fed. Cir. 2001)).

Plaintiffs argue that the only reason Commerce provided for preferring Egyptian electricity rates rather than Ukrainian electricity rates is because of Russia's invasion of Ukraine. Pl. Br. at 21.  This is incorrect: unlike Ukraine's SV data, Egypt's data electricity is

32

contemporaneous with the POR.  IDM at 21; *see also* Pl. Br. at 20 (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibits EGY-3A and UKR-3A (P.R. 161, 166)).  Further, Commerce found that Egypt's SV data for electricity are specific because the data are itemized by voltage levels and purpose of usage.  IDM at 21 (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibit EGY-3B (P.R. 161)).

Commerce similarly addressed plaintiffs' arguments concerning the inferiority of Egyptian SV data for labor and water.  *See* Pl. Br. at 19-22.  Commerce responded to plaintiffs' claim that Egyptian SV data for labor was not specific by finding that the data for "Plant and machine operators, and assemblers" is applicable to BMT and DakHoney's plant and factory workers.  IDM at 21 (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibit EGY-2 (P.R. 161)); *see also* Pl. Br. at 19.  Commerce responded to plaintiffs' claim that Egypt's SV data for water do not constitute a broad market average by finding the contrary because the data reflect two major cities.  *See* IDM at 21 (citing Petitioners' February 29, 2024 SC and SV Comments at Exhibit EGY-3A (P.R. 161)); *see* Pl. Br. at 21.

Plaintiffs take issue with the fact that Commerce did not separately discuss use of Egyptian labor, water, and truck freight brokerage SV data.  Pl. Br. at 19, 22.  Commerce separately responded to BMT's argument that Commerce should use Ukrainian SV data for raw honey and drums regardless of the surrogate country selected; neither BMT nor DakHoney raised such an argument in regard to these SVs.  *See* BMT's Administrative Case Brief at 26, 28 (P.R. 276).  Instead, DakHoney did not make any arguments regarding these SVs and BMT only included its arguments regarding them within its argument that Commerce should select Ukraine as the primary SC, which is also the section of the IDM where Commerce addressed these arguments.  *See id.* at 22 (P.R. 276); *see also* DakHoney's Administrative Case Brief at 6 (P.R.

33

281); and IDM at 21 (P.R. 305).  Moreover, Commerce "need not address every piece of evidence presented by the parties; absent a showing to the contrary, the court presumes that {Commerce} has considered all of the record evidence."  *See Siemens*, 38 C.I.T. at 885, 992 F.Supp.2d at 1324, *aff'd*, 806 F.3d 1367.

Plaintiffs' claim that Commerce's use of Egyptian SV data for electricity, labor, water, and truck freight and brokerage as the best information available on the record cannot be supported because the data are from prior to Russia's invasion of Ukraine.  Pl. Br. at 19-22. Regardless of whether Russia's invasion impacted Ukraine's SV data for these FOPs, when "Commerce is faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information."  *Dorbest*, 462 F. Supp. 2d at 1277.  As plaintiffs note, Egypt's SV data for water is not contemporaneous with the POR, both Egypt and Ukraine's SV data for labor are contemporaneous with the POR, and Egypt and Ukraine's SV data for truck freight and brokerage are both equally not contemporaneous with the POR.  *See* Pl. Br. 19, 21-22.  As discussed above, however, Commerce reasonably determined that Egypt has the best SV information on the record and continued to select it as the primary surrogate country in the Final Results and Commerce has a regulatory preference to "value all factors in a single surrogate country."  IDM at 29.

The Courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).  Once Commerce selected Egypt as the primary surrogate country, the preference to value all FOPs in Egypt implicitly became part of Commerce's analysis.  While two parties may disagree as to whether Egypt's SV data for these FOPs constituted the best information on the record, Commerce's determination must be upheld unless no "reasonable

34

mind could conclude that Commerce chose the best available information." *Jiaxing Bro.*, 822

F.3d at 1301 (citing *Zhejiang*, 652 F.3d at 1341). Thus, Commerce's determination that Egypt's

SV data for electricity, labor, water, and truck freight and brokerage constitute the best available

information on the record is supported by substantial evidence and in accordance with law.

**CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiffs' motion for

judgment on the administrative record and sustain Commerce's final results.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
SAMUIL AGRANOVICH                  NATALEE A. ALLENBAUGH
Attorney                           Trial Attorney
Office of the Chief                 Commercial Litigation Branch
Counsel for Trade Enforcement       United States Department of Justice
  & Compliance                      P.O. Box 480 | Ben Franklin Station
U.S. Department of Commerce         Washington, DC 20044
                                    (202) 507-6058 | Natalee.Allenbaugh@usdoj.gov

June 9, 2026                        Attorneys for the United States

35

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this

Court, that this brief contains 10,484 words, excluding the table of contents, table of authorities,

any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's

signature, as calculated by the word processing system used to prepare this brief (Microsoft

Word).

s/ Natalee A. Allenbaugh
NATALEE A. ALLENBAUGH

**CERTIFICATE OF SERVICE**

I certify that on May 15, 2026, I caused to be served by appropriate means under Administrative
Order 25-01, and with the consent of the parties, copies of Defendant's Confidential Response to
Plaintiff's Motion for Judgment Upon the Agency Record.

s/ Natalee A. Allenbaugh
NATALEE A. ALLENBAUGH