## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| BAN ME THUOT HONEYBEE JSC, ET. AL., ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| and ) | |
| ) | |
| BAO NGUYEN HONEYBEE CO, LTD, ET. AL., ) | |
| ) | |
| *Plaintiff-Intervenors*, ) | Before: The Hon. Richard K. Eaton, |
| ) | Senior Judge |
| v. ) | |
| ) | Court No.  25-00085 |
| UNITED STATES, ) | |
| ) | |
| *Defendant*, ) | |
| ) | |
| and ) | |
| ) | |
| AMERICAN HONEY PRODUCERS ASSOC. ) | |
| ) | |
| *Defendant-Intervenor*. ) | |
| ) | |

## REPLY BRIEF OF PLAINTIFFS BAN ME THUOT HONEYBEE JSC, ET AL. AND PLAINTIFF-INTERVENORS BAO NGUYEN HONEYBEE CO., LTD., ET AL.

Jonathan M. Freed
MacKensie R. Sugama
Didie Muller
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C. 20003
202-223-3760

*Counsel to Plaintiffs and Plaintiff-Intervenors*

Date: July 30, 2026

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 3

I.  DEFENDANTS FAIL TO ADDRESS SUBSTANTIAL DETRACTING EVIDENCE THAT UNDERMINES COMMERCE'S DECISION TO SELECT EGYPT AS THE PRIMARY SURROGATE COUNTRY ....................................................................... 3

    A.  Substantial Evidence Establishes that Ukraine was Economically Comparable and Offered Far Superior Product Comparability. ................. 4

    B.  Commerce's "War-in-Ukraine" Rationale is Speculative and Unsupported by the Record ...................................................................................... 9

II.  DEFENDANT AND DEFENDANT-INTERVENOR FAIL TO ESTABLISH THAT COMMERCE'S SURROGATE VALUE SELECTIONS WERE THE BEST INFORMATION ON THE RECORD ............................................................................ 11

    A.  Defendant and Defendant-Intervenor Fail to Meaningful Address the Contemporaneity Issue with the Egyptian Surrogate Value Data . .......... 12

    B.  Defendant and Defendant-Intervenor Fail to Establish How Egyptian Data Meets the "Best Available Information" Standard .................................. 13

    C.  Plaintiffs Did Not Fail to Exhaust the Argument that the Egyptian FAO Data is Not a Broad Market Average....................................................... 16

    D.  The Comparison of the Surrogate Value Data for Drums Does Not Favor Selection of Egypt as the Surrogate Country.......................................... 17

    E.  The Comparison of the Surrogate Value Data for Labor, Electricity, Water, and Trucking Freight and Brokerage Does Not Favor the Selection of Egypt as the Surrogate Country.......................................................... 18

III. .  THIS COURT HAS SUBJECT MATTER JURISDICTION .................................... 20

IV. .  CONCLUSION....................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 179 F. Supp. 3d 1256 (Ct. Int'l Trade 2016) ..................................................................................................6

*Arlanxeo USA LLC v. United States*, 337 F. Supp. 3d 1350 (Ct. Int'l Trade 2018) ......................22

*Ban Me Thuot Honeybee JSC v. United States*, 805 F. Supp. 3d 1350 (Ct. Int'l Trade 2025)......21

*Bio-Lab, Inc. v. United States*, 776 F.Supp.3d 1315 (Ct. Int'l Trade 2025) ....................................8

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .........................................9, 11

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010)...........................9

*Georgetown Steel Corp. v. United States*, 801 F.2d 1308 (Fed. Cir. 1986)..................................20

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006).....................12

*Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 106 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) ........................................................................................................21

*Jiaxing Brother Fastener Co. v. United States*, 751 F.Supp.2d 1345 (Ct. Int'l Trade 2010) ...........................................................................................................................................16

*NMB Singapore Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) .......................................11

*Qingdao Taifa Group Co., Ltd. v. United States*, 637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ...........................................................................................................................................16

*Rhone-Poulenc, Inc. v. United States*, 927 F. Supp. 451 (Ct. Int'l Trade 1996) .......................9, 16

*Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947).....................................................10

*Shakeproof Assembly Components v. United States*, 268 F.3d 1376 (Fed. Cir. 2001)...................12

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951) ..........................................................11

*Vinh Hoan Corp. v. United States*, 49 F.Supp.3d 1285 (Ct. Int'l Trade 2015)................7, 8, 14, 20

**Statutes**

19 U.S.C. § 1516a.............................................................................................................................21

19 U.S.C. § 1677b(c) .........................................................................................................................7

19 U.S.C. § 1677b(c)(1)............................................................................................11, 14

19 U.S.C. § 1677b(c)(1)(B) ...............................................................................................14

19 U.S.C. § 1677b(c)(4)(B) ..............................................................................................3, 7


**Administrative Determinations**

*Drawn Stainless Steel Sinks from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 76,174 (Nov 6, 2023) ..................... 13

*Raw Honey from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review*; 2021-2023, 90 Fed. Reg. 15,553 (Apr. 14, 2025)............................... 1

**REPLY BRIEF OF PLAINTIFFS BAN ME THUOT HONEYBEE JSC, ET AL. AND PLAINTIFF-INTERVENORS BAO NGUYEN HONEYBEE CO., LTD., ET AL.**

## INTRODUCTION

Plaintiffs Ban Me Thuot Honeybee JSC, Daklak Honeybee Joint Stock Company, Dak Nguyen Hong Exploitation of Honey Company Limited TA, Daisy Honey Bee Joint Stock Company, Hoa Viet Honeybee One Member Company Limited, Hanoi Honeybee Joint Stock Company ("Plaintiffs"), and Plaintiff Intervenors Bao Nguyen Honeybee Co., Ltd., Dongnai Honey Bee Corp., and Huong Rung Trading-Investment and Export Company Limited, Hoang Tri Honey Bee Co., Ltd., Nhieu Loc Company Limited, Southern Honey Bee Co., Ltd., Thanh Hao Bees Co., Ltd., Viet Thanh Food Co., Ltd., and Spring Honeybee Co. Ltd. ("Plaintiff-Intervenors," collectively, "Plaintiffs"), submit this brief in reply to the June 9, 2026, response brief filed by Defendant, the United States, *see* Def. Resp to Pls. Rule 56.2 Mot. J. Upon Agency. R., ECF No. 61 (June 9, 2026) ("Def. Resp. Br."), and in reply to the June 22, 2026, response brief filed by Defendant-Intervenor, American Honey Producers Association. *See* Def. Int. Resp. to Pls. Rule 56.2 Mot. J. Upon Agency R., ECF No. 62 (June 22, 2026) ("Def. Int. Resp. Br."). Plaintiffs contest numerous aspects of the U.S. Department of Commerce's ("Commerce") first administrative review of the antidumping duty order on *Raw Honey from the Socialist Republic of Vietnam*. *See* Pl's. Rule 56.2 Mot. J. Agency R., ECF No. 53 (Feb. 17, 2026) ("Pls. Br."), *see also Raw Honey from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review*; 2021-2023, 90 Fed. Reg. 15,553 (Apr. 14, 2025) ("Final Results"), P.R. 313, and accompanying Issues and Decision Memorandum, P.R. 305 ("Final Results Memo").

In their response briefs, Defendant and Defendant intervenor rely heavily on the discretion that Commerce has in administering the antidumping law. As demonstrated below,

critical parts of Commerce's decision deserve no deference because they ignore important evidence developed on the record, or because Commerce relied on factually incorrect information.

Before entering into this analysis, Plaintiffs respectfully remind the Court of the real world consequences of allowing the agency to have unbridled discretion in an administrative review involving exports from a country to which Commerce applies its non-market economy ("NME") methodology. In the investigation of this order, Commerce calculated a final dumping margin of approximately 60 percent using India as a surrogate country. Importers and exporters made business decisions on the basis of that determination, recognizing that the retrospective nature of the review system means that final liability could be different. However, the change in surrogate country from a major honey producer such as India to a minor producer such as Egypt yielded surrogate information of poor quality which significantly impacted the result and upset the legitimate expectations of the exporters and importers involved in honey trade. If the intent of an AD deposit is to allow exporters and importers to adjust their prices in order to avoid dumping, Commerce's untethered discretion to select surrogate countries frustrates that intent and purpose. Here, Ukraine, like India, was a major honey producer and the record contained robust surrogate information reflective of more significant production and trade. Commerce can certainly change surrogate countries when justified by the evidence, but here the evidence indicates that Egypt offered worse, not better information than Ukraine offered.

In their response briefs, Defendant and Defendant Intervenor rely almost exclusively on Commerce's broad discretion to justify its selection of Egypt as a primary surrogate country over Ukraine. In disregarding substantial detracting evidence, especially non-contemporaneous surrogate value information from Egypt, Defendant blindly adhered to Commerce's Surrogate

Country List, without acknowledging that Commerce considers all surrogate country lists as non-exhaustive, or that data from Ukraine, when compared to data from Egypt, served as the best available information on the record. Finally, the main reason that Commerce offered for disregarding the Ukraine information, that Russia's invasion of Ukraine distorted the surrogate information available, is disproven by the record because the surrogate information for the raw honey predated Russia's February 2022 invasion. For the reasons below, the Court should remand this case to Commerce with instructions consistent with the arguments provided below.

**ARGUMENT**

I. **DEFENDANTS FAIL TO ADDRESS SUBSTANTIAL DETRACTING EVIDENCE THAT UNDERMINES COMMERCE'S DECISION TO SELECT EGYPT AS THE PRIMARY SURROGATE COUNTRY**

In response to Plaintiffs' arguments that the selection of Egypt as the primary surrogate country was unsupported by substantial evidence, Defendant and Defendant Intervenor assert that (1) Egypt is on the Surrogate Country List and (2) that the Russian invasion of Ukraine impacted Ukraine's economy, affecting Ukraine's viability as a surrogate country. Def. Resp. Br., at 20–23; Def. Int. Resp. Br., at 14–16. Yet, Defendant and Defendant Intervenor fail to acknowledge that Commerce itself recognized Ukraine as economically comparable to Vietnam pursuant to 19 U.S.C. § 1677b(c)(4)(B), determining that Ukraine is within the range of per-capita Gross National Income ("GNI") of the countries on the Surrogate Country List. *See* Final Results Memo, at Comment 5. Second, Defendant and Defendant-Intervenors fail to confront the speculation and lack of record support that are at the heart of Commerce's conclusion that the Russian invasion of Ukraine in some way affected Ukraine's honey industry, even before the war began. For the reasons described below, Defendant and Defendant-Intervenor fail to address substantial detracting evidence that undermines Commerce's decision to select Egypt as the

3

primary surrogate country.

**A. Substantial Evidence Establishes that Ukraine was Economically Comparable and Offered Far Superior Product Comparability**

In selecting surrogate countries, Commerce's longstanding practice has been to identify and assemble a non-exhaustive list of countries that are at a level of economic development comparable to the non-market economy country. In this case, Commerce's Surrogate Country List included Indonesia, Jordan, Egypt, Philippines, Morocco, and Sri Lanka. Commerce Memorandum, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," (Jan. 25, 2024) ("Request for SV Comments"), P.R. 112. Plaintiffs and Defendant-Intervenor submitted surrogate value information from India, Egypt, and Ukraine, with Ukraine falling within the GNI "band" of the countries on Commerce's list. *See* Commerce Memorandum, "Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review: Raw Honey from the Socialist Republic of Vietnam; 2021-2023," at 11 (June 28, 2024) ("Prelim SV Memo"), P.R. 246. Subsequently, Commerce found that India was not economically comparable to Vietnam during the period of review ("POR"). *Id.*, at 13. Notwithstanding its decision regarding India's lack of economic comparability to Vietnam, Commerce determined that Ukraine, although not on the Surrogate Country List, was within the range of GNIs of the countries on the Surrogate Country List and thus, was economically comparable to Vietnam during the POR. *See* Final Results Memo, at Comment 5 ("{W}e find that {Ukraine} is economically comparable to Vietnam within the meaning of section 776(c)(4)(A) of the Act."). Based on this decision, Commerce effectively expanded the Surrogate Country List beyond the original six countries to include Ukraine.

In their response briefs, neither Defendant nor Defendant-Intervenor meaningfully confront the central deficiency identified by Plaintiffs that is at the root of this appeal:

4

Commerce determined that Ukraine satisfied the statutory criteria for surrogate country selection and accepted Ukraine as an economically comparable country with significant production of comparable merchandise. *Id.* Yet, after determining that Ukraine was a viable surrogate country, Commerce then failed to explain how Ukraine's alleged deficiencies as a surrogate country could outweigh its substantial advantages compared to Egypt, or why those deficiencies justified selecting Egypt instead. The only deficiency in the Ukraine honey surrogate value mentioned within Commerce's Final Results Memo was that Russia's war in Ukraine affected Ukraine's honey industry "such that Ukrainian raw honey prices would not be suitable" as a surrogate value. *See* Final Results Memo, at 22–23. However, as raised in the Plaintiffs' opening brief and discussed below, Russia's invasion of Ukraine did not occur until after the time period for which the Ukrainian honey surrogate value data had been provided. Pls. Br., at 12.

Contrary to Defendant-Intervenor's argument, Plaintiffs submitted substantial evidence demonstrating that the surrogate value data from Ukraine was more reliable and representative than available data from the other countries on the Surrogate Value List, including Egypt, which fully addressed Commerce's goal of selecting a surrogate country that ensured availability and quality of surrogate value data. *See* Def. Int. Resp. Br., at 14–15; *see also* BMT Submission, "30-Day Surrogate Value Comments and Information," (May 29, 2024) ("BMT 30-Day Comments"), P.R. 215. Defendant-Intervenor's response is especially unavailing considering it also argued initially that both Ukraine or Egypt could be selected as the primary surrogate country. *See* Petitioners' Surrogate Country and Preliminary Surrogate Value Comments, at 1–12 (Feb. 29, 2024) ("Petitioner SV1"), P.R. 161. Now, taking the opposite position, Defendant-Intervenor asserts that Ukraine should not be selected because it was not on

5

Commerce's surrogate country list.  In doing so, Defendant-Intervenor ignores substantial record evidence in claiming that Plaintiffs failed to meet the burden of establishing the need for Commerce to look off its Surrogate Country List.  Def. Int. Resp. Br., at 14–15.  The record demonstrates otherwise.

First, as mentioned above, Defendant-Intervenor itself argued to Commerce that it should rely on Ukraine as the surrogate country.  As such, all parties and the agency agree that Ukraine is economically comparable to Vietnam and a significant producer of comparable merchandise.  *See* Petitioner SV1, at 1–12.  More importantly, Commerce does not set a preference for countries on the Office of Policy list, which itself affirms the list, at the time of issuance, is a "non-exhaustive" list and that selecting a country that is not on the list might be required due to data availability and other factors.  *See* Request for SV Comments; *see also An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 179 F. Supp. 3d 1256, 1269 (Ct. Int'l Trade 2016) (explaining that "{w}hile Commerce acknowledged that Indonesia is less economically comparable to Vietnam as compared to the countries on the OP List, Commerce reasonably concluded that data considerations, particularly those relating to the primary input for the subject merchandise. . . outweigh the fact that Indonesia is not at the same level of economic development as Vietnam.  Therefore, Commerce's primary surrogate country selection is sustained.").  Here, data considerations and market comparability, as discussed below, overwhelmingly demonstrate that pricing data from Ukraine for identical merchandise outweigh any concerns that Ukraine did not appear on the non-exhaustive Surrogate Country List.  *Id.*, at 1269.  Further, the record shows that Commerce determined Ukraine was economically comparable to Vietnam, and no party disputed this finding.  Final Results Memo, at 20.

In addition to considering economic comparability, Commerce must also consider whether a potential surrogate country is a significant producer of comparable merchandise. In the instant review, Commerce determined that both Egypt and Ukraine are significant producers of comparable merchandise under 19 U.S.C. § 1677b(c)(4)(B), while acknowledging that Ukraine was comparatively a much larger producer than Egypt. Final Results Memo, at 14–15. In this case, when more than one country is economically comparable and a significant producer of comparable merchandise, Commerce selects the country with the best available data for valuing the factors of production. *See Vinh Hoan Corp. v. United States*, 49 F.Supp.3d 1285, 1303–04 (Ct. Int'l Trade 2015) (noting that 19 U.S.C. § 1677b(c) mandates that Commerce value the factors of production on the basis of the best available information).

Defendant and Defendant-Intervenor fail to acknowledge the substantial evidence establishing that Ukraine is by far a more significant producer of honey than Egypt. In doing so, Defendant and Defendant-Intervenor try to mischaracterize Plaintiffs' statement with respect to the "significant producer" prong of Commerce's surrogate country selection framework. *See* Def. Resp. Br., at 5; Def. Int. Resp. Br., at 13–14. Plaintiffs never asserted that Egypt does not produce any comparable merchandise. Rather, the record establishes that Ukraine produces more than **fifteen times** the volume of honey on the world market than Egypt does. Final Results Memo, at 20. Indeed, Commerce itself recognized that "{p}roduction statistics from the FAO indicate that Ukraine and Egypt accounted for 4.4 percent and 0.3 percent (or 63,079 and 4,040 metric tons of global natural honey production quantity out of 1,675,149 metric tons), respectively, for 2022." *Id.* (citing, BMT's Letter, "Comments on List of Economically Comparable Countries," at Exhibit 1 (Feb. 9, 2024), P.R. 130–133). While Defendant-Intervenor asserts that this Court has previously sustained aberrational surrogate values, citing *Bio-Lab, Inc.*

7

*v. United States*, 776 F.Supp.3d 1315 (Ct. Int'l Trade 2025), this case addressed the per-unit value of a single factor of production used in a much more complex chemical product. Def. Int. Resp. Br., at 2. Here, because raw honey is overwhelmingly the most important factor of production to produce processed honey, the relative significance of honey production in Ukraine is a threshold issue that affects the reliability and accuracy of the ultimate selected surrogate values.

As such, the stark disparity in the scale of production between Egypt and Ukraine demonstrates that surrogate information from Ukraine offers far more reliability and market-representativeness. A country that produces roughly fifteen times the honey of another will have a greater amount and breadth of activity around honey production. The relative size of the industries in the two countries was substantial evidence in determining which country's data offers greater breadth of information. Commerce cannot reasonably ignore significantly detracting record evidence which affects its choice of a primary surrogate country. *Vinh Hoan Corp.*, 49 F.Supp.3d, at 1301 ("Commerce cannot ignore record data. . . which may affect its choice of a primary surrogate country.").

Furthermore, Commerce's own surrogate value selection criteria instruct it to favor data that is "representative of a broad market average." *See* Commerce Memorandum, "Non-Market Economy Surrogate Country Selection Process," (March 1, 2004) ("Policy Bulletin 04.1"), available at https://access.trade.gov/Resources/policy/bull04-1.html. The relative insignificance of Egypt's honey production compared to that of Ukraine is highly relevant to Commerce's requirement to select data that better satisfies the broad-market nature of the surrogate values available. This information, in turn, is relevant when determining which country should be selected as the primary surrogate country. Yet, Commerce failed to address this disparity in any

8

meaningful way in the Final Results, and Defendant and Defendant-Intervenor offer no defense of Commerce's position other than to ignore it as a consideration.

Finally, both Defendant and Defendant-Intervenor rely heavily on the principle that Commerce has "broad discretion" in selecting surrogate countries and surrogate values.  *See* Def. Resp. Br., at 20–21; Def. Int. Resp. Br., at 3.  However, an agency determination that ignores detracting record evidence that undermines its conclusions, or that relies on a factor that is demonstrably erroneous, cannot be sustained.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *see also Rhone-Poulenc, Inc. v. United States*, 927 F. Supp. 451, 454 (Ct. Int'l Trade 1996) (Commerce's determinations will be held unlawful "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions.").  Moreover, Defendant's and Defendant-Intervenor's repeated reliance on agency discretion implicitly acknowledges the weakness of the evidentiary foundation of the decision. Accordingly, because Commerce "failed to take into account whatever in the record fairly detracts from its weight," the decision to select Egypt as the primary surrogate country instead of Ukraine is unsupported by substantial evidence.  *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (the Court "looks to the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence.").

### B.    Commerce's "War-in-Ukraine" Rationale is Speculative and Unsupported by the Record

Second, Defendant and Defendant-Intervenors broadly cite to Commerce's reliance on the war in Ukraine to disregard it as a primary surrogate country.  Commerce suggested that the invasion in Ukraine affected Ukrainian raw honey data such that the data were not suitable.  *See* Final Results Memo, at 22–23.  As Plaintiffs argued in their 56.2 Motion, this reasoning is factually incorrect.  *See* Pls. Br., at 12.  Ukraine's raw honey surrogate value data is from 2021,

which is *prior to* Russia's invasion in February 2022.  If Commerce's concern was that the

invasion led to economic conditions that distorted Ukrainian honey prices, that concern does not

apply to the period of time applicable to the data on the record.  Commerce offered no analysis

demonstrating that pre-invasion 2021 Ukrainian prices were distorted by the subsequent conflict,

nor does common sense suggest how that could be the case.  Accordingly, Commerce's rejection

of Ukrainian data on this basis is not supported by substantial evidence.

Defendant and Defendant-Intervenor attempt to recharacterize Commerce's reasoning by

claiming that the war rationale was not Commerce's "sole" reason for disfavoring Ukrainian

data.  *See* Def. Resp. Br., at 29; Def. Int. Resp. Br., at 31.  However, Commerce's Final Results

Memo explained that Russia's war with Ukraine was the sole reason offered for finding the

Ukrainian honey prices unsuitable for use as surrogate values.  *See* Final Results Memo, at 23.

The Court reviews the agency's stated reasoning, and not counsel's attempted *post hoc*

rationalizations.  Therefore, Commerce's rationale and the only rationale for disregarding the

Ukrainian honey prices lacks any basis in the record evidence.

Defendant attempts to draw out new reasoning for Commerce's preference of the

Egyptian data over the Ukraine data, but the Final Results Memo was forceful in stating

Commerce's position that Russia's invasion of Ukraine was the only reason Commerce

preferred Egypt over Ukraine.  Def. Resp. Br., at 24–35.  These new, albeit flimsy, rationales

were not articulated in Commerce's Final Results.  *See* Final Results Memo, at 22–23.  It is

well established that agency determinations must be reviewed by the rationales on which the

agency relied and cannot be based on any *post hoc* rationalizations.  *See Sec. & Exch. Comm'n*

*v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (affirming the fundamental rule of administrative

law that "a reviewing court, in dealing with a determination or judgment which an

administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").  Accordingly, Defendant's and Defendant-Intervenor's *post hoc* rationalizations for agency action cannot serve as a substitute for the agency's own reasoning.  *See Burlington Truck Lines*, 371 U.S. at 169 (affirming that "{f}or the courts to substitute their or counsel's discretion for that of the {agency} is incompatible with the orderly functioning of the process of judicial review.); *see also NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1331 (Fed. Cir. 2009) (declining to make factual findings on an issue the agency did not discuss by stating that "Commerce did not discuss this, and we may not make such a factual determination in the first instance.").

## II.    DEFENDANT AND DEFENDANT-INTERVENOR FAIL TO ESTABLISH THAT COMMERCE'S SURROGATE VALUE SELECTIONS WERE THE BEST INFORMATION ON THE RECORD

The primary mandate under the surrogate value selection statute is that Commerce value the factors of production using "the best available information."  19 U.S.C. § 1677b(c)(1).  As demonstrated below, contrary to Defendant's and Defendant-Intervenor's arguments, Commerce did not reasonably consider information on the record and failed to select the best available surrogate data on the record.  As with Commerce's surrogate country selection, Defendant and Defendant-Intervenor continue to broadly rely on agency discretion to support their assertions that the selection of Egypt as the primary surrogate country should be upheld. Def. Resp. Br., at 24, 29; Def. Int. Resp. Br., at 17.  However, under the substantial evidence standard, the reviewing court's role is to evaluate whether a reasonable mind could conclude that Commerce chose the best available information.  *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951).  Here, as further detailed below, Commerce's sole rationale for rejecting the Ukrainian honey surrogate value information cannot be supported by the record.  The raw

11

honey surrogate value data comes from 2021 Ukrainian government statistics, which overlap directly with the first five months of the POR.  In contrast, the Egyptian data predated the start of the POR by two years.  Egypt's surrogate value information also reflects broad distortions that Commerce acknowledged affected Egypt throughout the POR.  The only flaw in the Ukrainian honey surrogate value that Commerce identified cannot be supported by the record.  An objective evaluation of the evidentiary record developed by Commerce could not lead a reasonable mind to choose the Egyptian information rather than the Ukrainian information.  *See Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001); *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (Ct. Int'l Trade 2006) ("{t}his court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'").

### A.  Defendant and Defendant-Intervenor Fail to Meaningful Address the Contemporaneity Issue with the Egyptian Surrogate Value Data

As explained in its opening brief, Commerce relied on Egyptian honey data from 2019, *i.e.*, two years prior to the start of the POR.  Pls. Br., at 9–10; *see also* Submission from BMT, "Comments on Surrogate Values," at Exhibit SC-2.A (Feb. 29, 2024) ("BMT's SV Submission"), P.R. 146–151; *see also* Petitioner SV1, at Exhibit EGY-1A.  To address this concern, Commerce applied an inflation adjustment of 130 percent to bring Egypt's 2019 FAO data forward to the POR.  *See* Prelim SV Memo, at 3.  Yet, the non-contemporaneity of the Egyptian surrogate pricing data is a major deficiency in this proceeding given there is only one main input for the primary factor of production —raw honey.  *See* Pls. Br., at 9.  Defendant argues that non-contemporaneity is merely "one factor" among several and that Commerce was within its discretion to apply an inflation adjustment to align Egypt's 2019 FAO data with the

12

POR.  *See* Def. Resp. Br., at 25.  However, this argument misapprehends both the magnitude of the underlying problem with the Egyptian data and Commerce's obligation to use the best available information.

The raw honey input in this case accounts for the single largest component of production costs, representing the overwhelming share of the cost of manufacturing of the subject merchandise.  When the primary input dominates costs to such a degree, the quality and accuracy of the surrogate value for that input is paramount.  Commerce's own practice, reflected in *Drawn Stainless Steel Sinks*, is to focus on valuing key material inputs by prioritizing the surrogate country that yields the best surrogate value information for the dominant input.  *See Drawn Stainless Steel Sinks from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 76,174 (Nov 6, 2023), accompanying Issues and Decision Memorandum, Comment 2.  The Egyptian honey source from 2019 is not merely "less contemporaneous" than Ukraine's 2021 data—it is from a fundamentally different market period.  *See* BMT's SV Submission, at Exhibit SV-2.A; *see also* Petitioner SV1, at Exhibit EGY-1A.  The record establishes that global honey prices fluctuated significantly between 2019 and the POR, and the application of a general inflation index cannot substitute for actual market prices during the POR.  BMT Submission, "Rebuttal Comments and Information Relating to Petitioner's Surrogate Value Submission," at Exs. 1 and 2 (June 10, 2024) ("BMT Rebuttal SV Comments"), P.R. 231–33.

**B. Defendant and Defendant-Intervenor Fail to Establish How Egyptian Data Meets the "Best Available Information" Standard**

Defendant and Defendant-Intervenor argue that Commerce properly applied its surrogate value selection criteria and that the Egyptian FAO data are "publicly available, product-specific, representative of a broad market average, and tax-exclusive".  *See* Def. Resp.

13

Br., at 25; Def. Int. Resp. Br., at 18–19; *see also* Prelim. SV Memo.  However, this statutory

inquiry—whether the data from the surrogate country constitutes the "best available

information" on the record—is a *comparative* evaluation of the quality, reliability, and fitness

of the competing datasets.  *See* 19 U.S.C. § 1677b(c)(1); *see also Vinh Hoan Corp.*, 49

F.Supp.3d at 1315 ("{W}hen Commerce compares the data from {comparable} producers, it is

being asked to weigh the specificity of the competing data so as to determine the best available

information on the record to value the input.").  Defendant and Defendant-Intervenor argue that

because Egypt satisfies the threshold eligibility criteria, its data must be accepted as adequate.

*See* Def. Resp. Br., at 25; Def. Int. Resp. Br., at 18–19.  But, the general sufficiency of one

potential surrogate country does not permit Commerce to select it while ignoring the fact that

another surrogate country offers better information more specific to the key material input, or

inputs, in question.  The statute instructs that the valuation of the factors of production "shall be

based on the **best** available information."  *See* 19 U.S.C. §1677b(c)(1)(B).  Moreover, "the

country with the **best** factors data is selected as the primary surrogate country . . . data quality is

a critical consideration affecting surrogate country selection."  *See* Policy Bulletin 04.1

(emphasis added).

The word "best" is a superlative that is inherently comparative.  It requires Commerce to

look across the full range of information on the record and identify, through logical and

reasoned analysis, which dataset provides the superior quality, reliability, and fitness.  In

evaluating whether Egyptian data is *better than* Ukrainian data, the Egyptian data is

demonstrably inferior.  Ukraine's raw honey surrogate value data comes from 2021 Ukrainian

government statistics that overlap directly with the first five months of the POR.  The Egyptian

data, by contrast, is a 2019 FAO national producer price, predating the start of the POR by two

14

years.  Ukraine's surrogate value information is also substantiated by multiple sources, is reflective of a broad geographic market, and is not subject to the documented currency and inflation distortions that Commerce acknowledged affected Egypt throughout the POR.  *See* BMT 30-Day Comments; BMT Rebuttal SV Comments, at Exs. 1, 2.  This is not a small difference in quality—it is the difference between actual market prices during the relevant period and a two-year-old price inflated by country-wide indices.  Commerce's determination that this difference did not matter ignores substantial evidence and cannot be sustained.

Defendant's support for Commerce's price-anomaly reasoning is equally unavailing. Def. Resp. Br., at 25.  And Defendant-Intervenor's claim that "Plaintiffs failed to satisfy their burden of submitting evidence to prove that the Egyptian FAO data are aberrational" is meritless. Def. Int. Resp. Br., at 22.  Commerce stated that they did "not have enough information on the record to conclude why" the average 2019 export price of finished packed honey from Egypt was lower than the 2019 FAO producer price of raw honey from Egypt.  *See* Final Results Memo, at 21.  Defendant and Defendant-Intervenor attempt to rehabilitate this admission by characterizing it as a "reasonable assumption," asserting that Commerce reasonably assumed the FAO and UN Comtrade datasets "did not compare the same subclassifications of honey" and that "the data comes from different sources and are calculated using different averages".  *See* Def. Resp. Br., at 25; Def. Int. Resp. Br., at 22.  These assumptions do not constitute a reasoned explanation. Rather, Commerce did not find that the price anomaly was explained but rather found that it could not explain it.  Therefore, a reasonable mind could only conclude that Egyptian FAO raw honey data should not have been adopted as the best available information.  A dataset whose internal pricing relationship Commerce cannot reconcile with observable market data from the same country, same year, and same commodity, being sold at export for thirty percent less than

15

the raw input, is not reliable data.

This Court has found unlawful Commerce's determinations "where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc.*, 927 F. Supp. at 454. Here, Commerce's explanation failed to articulate a reasoned comparative analysis, which demonstrates that the selection of Egypt's objectively deficient pricing data in lieu of contemporaneous and superior data from Ukraine is not supported by substantial record evidence and cannot be sustained.

### C. Plaintiffs Did Not Fail to Exhaust the Argument that the Egyptian FAO Data is Not a Broad Market Average

Defendant and Defendant-Intervenor contend that Plaintiffs failed to "raise arguments regarding whether the FAO data is representative of a broad market average" and that this Court should decline to consider the argument on grounds of failure to exhaust administrative remedies. *See* Def. Resp. Br., at 25; Def. Int. Resp. Br., at 23–24. However, Plaintiffs' argument regarding the weakness of the FAO data as a broad market average was in response to an argument by Commerce that it raised only in the *Final Results*. *See* Pls. Br., 11. A party cannot somehow fail to an exhaust an argument if the agency's position was only articulated for the first time in a final decision. *See Jiaxing Brother Fastener Co. v. United States*, 751 F.Supp.2d 1345, 1356 (Ct. Int'l Trade 2010) (holding that "plaintiffs may raise arguments before the Court of International Trade that were not raised in a case brief before Commerce 'if Commerce did not address the issue until its final decision,' where the result was that the party did 'not have . . . a full and fair opportunity to raise the issue at the administrative level.'") (citing *Qingdao Taifa Group Co., Ltd. v. United States*, 637 F. Supp. 2d 1231, 1236 (Ct. Int'l Trade 2009)). It was only in the *Final Results* that Commerce compared the simple-average

16

nature of the Egyptian FAO data to the weighted-average nature of the Ukrainian UN Comtrade

data as a possible explanation why there was a significant disparity between the FAO producer

prices and the UN Comtrade export prices.  *See* Final Results Memo, at 21.  As such,

Defendant's and Defendant-Intervenor's exhaustion argument is entirely inapplicable here.

#### D.  The Comparison of the Surrogate Value Data for Drums Does Not Favor Selection of Egypt as the Surrogate Country

As explained above, Commerce's surrogate policy memorandum instructs it to evaluate

the reliability and completeness of the data in similarly situated surrogate countries and to select

the primary surrogate country with the best available data.  *See* Policy Bulletin 04.1, ("the

country with the best factors data is selected as the primary surrogate country. . . data quality is a

critical consideration affecting surrogate country selection.").  Plaintiffs argued that the second

most important factor of production, drums, also weighed in favor of selecting Ukraine over

Egypt because there is no record evidence to show that the Ukrainian drum values are not

specific, anomalous, or otherwise unreliable.  Pls. Br., 17–18.  Yet, the Egyptian information for

drums reflects inherent anomalies in the reported import quantities, which call into question the

reliability of the data.  *Id.*  Defendant offers possible explanations why the anomaly identified by

Plaintiffs—the disparity between the TDM import data and the GTA import data—does not

impugn the reliability of the GTA import data.  Def. Resp. Br., at 31.  Yet, even if Defendant's

explanation could be considered reasonable, it does not detract from the fact that the comparison

of the competing drum surrogate values available in Egypt and Ukraine does not weigh in favor

of selecting one country over the other as the primary surrogate country.

Defendant-Intervenor argues that Plaintiffs failed to establish that the Egyptian surrogate

value for drums is aberrational.  *See* Def. Int. Resp. Br., at 26–27.  But, trying to assess the

aberrational nature of data is not always a relevant line of inquiry when evaluating the "best

information standard," which assesses the country that offers more reliable and accurate surrogate value data in accordance with Commerce's Policy Bulletin guidance on selecting the primary surrogate country. *See* Policy Bulletin 04.1. In addition, the cases cited by Defendant-Intervenor relate to instances where Commerce is considering which surrogate values to select within a surrogate country, not which surrogate country should be selected as the primary surrogate country. *See* Def. Int. Resp. Br., at 26–27.

### E. The Comparison of the Surrogate Value Data for Labor, Electricity, Water, and Trucking Freight and Brokerage Does Not Favor the Selection of Egypt as the Surrogate Country

In its opening brief, Plaintiffs raised five other comparisons between the surrogate value information available in Ukraine and in Egypt. Pls. Br., at 19–22. While none of those comparisons weigh as strongly as the Ukrainian honey surrogate information weighs in favor of selecting Ukraine over Egypt, they nevertheless further detract from the reasonableness of Commerce's selection of Egypt as the primary surrogate country. For each of these other data points, as explained below, Defendant and Defendant-Intervenor failed to rebut Plaintiffs' specific showing that Ukrainian surrogate data for labor, electricity, water, and freight was more product-specific and less aberrational, instead relying on generic "best available" assertions and misapplying war-related disruption claims to pre-invasion 2020–2021 data.

With regard to labor, Defendant merely reiterated a statement from the Final Results Memo where Commerce simply concluded that the Egyptian labor surrogate value category, Plant and machine operators, and assemblers, "is applicable to the respondent's plant and factory workers." Def. Resp. Br, at 33, *citing* Final Results Memo, at 21. Defendant did not respond to Plaintiffs' argument that the "Manufacture of food products; beverages and tobacco products" category from Ukraine was more specific to the Vietnamese respondents' labor than the Egyptian labor category of "Plant and machine operators, and assemblers." *See* Pls. Br., at 19.

18

Furthermore, to support Commerce's decision to ignore Ukrainian labor data, Defendant-Intervenor continued to invoke the war in Ukraine as a reason for causing "severe labor market disruptions," despite the data reflecting the time period *prior* to the invasion, *i.e.*, in 2021.  Def. Int. Resp. Br., at 29.  As such, none of Defendant-Intervenor's assertions on the war in Ukraine affecting labor data are applicable or availing.

With regard to electricity, Defendant and Defendant-Intervenor still have only reiterated that the Egyptian electricity information is more contemporaneous, and they fail to address the substantive issue present in the data, *i.e.*, that it is less reliable than product-specific Ukrainian electricity data that distinguishes between commercial and household use.  Def. Resp. Br., at 32–33, Def. Int. Resp. Br., at 31–32; *see also* Pls. Br., at 20–21.  While Commerce and Defendant-Intervenor claim the electricity data is separated into different "voltage levels and purposes of usage," this is a generous description at best.  Def. Int. Resp. Br., at 31; Final Results Memo, at 21.  The electricity data for Egypt only covers five general categories of usage, covering broad usage such as "subscribers" and "metro," none of which distinguishes between commercial and residential use.  Petitioner SV1, at Ex. EGY-3A.  Commerce was obligated to address the lack of specificity in the Egyptian electricity data, and it failed to adequately explain why more favorable Ukrainian SV information was disregarded in favor of less reliable Egyptian information.

As to Plaintiffs' arguments concerning water and truck freight brokerage SV data, Defendant does not engage with any substantive issues raised by Plaintiffs.  Instead, Defendant asserts that Commerce selected the "best available information" and it continued to invoke the war in Ukraine as a reason to categorically reject all data sourced from Ukraine, even where it reflected data prior to the invasion.  Def. Resp. Br., at 33–34.  Similarly, Defendant-Intervenor

broadly relies on the war in Ukraine to establish that freight and logistics costs from Ukraine are unreliable and aberrational.  Def. Int. Resp. Br., at 34–35.  Yet, as made clear from Plaintiffs' brief, the Ukrainian information on the record to value truck freight charges and domestic brokerage services was from the 2020 edition of the World Bank's Doing Business reports.  Petitioner SV1, at Ex. EGY-3B, UKR-3B.  Commerce and Defendant-Intervenor cannot reasonably conclude that the 2020 freight and brokerage values for Ukraine are unreliable solely because of Russia's invasion of Ukraine in 2022.  Similarly, Defendant-intervenor cannot assert that Ukraine's water data from January 2021 through January 27, 2022, was (1) not contemporaneous or (2) that it was affected by the occupation of Sevastopol.  Def. Int. Resp. Br., at 33.  Neither of these contentions are defensible or factually correct.  More importantly, Commerce failed to engage with the substantial evidence establishing that surrogate pricing from Ukraine for labor, electricity, water, and freight and brokerage contained less aberrations and served as a more product-specific source.  In doing so, it failed to select surrogate information in accordance with the mandated "best information" standard.  *Vinh Hoan Corp.*, 49 F.Supp.3d at 1289–99 ("Commerce must base its analysis on the best available information.  Here, Commerce had information on the record that informed the precise question in front of it and it chose to disregard it.").

## III.    THIS COURT HAS SUBJECT MATTER JURISDICTION

Finally, Defendant-Intervenor asserts that this Court lacks subject matter jurisdiction.  Def. Int. Resp. Br., at 6–8 (citing *Georgetown Steel Corp. v. United States*, 801 F.2d 1308, 1312 (Fed. Cir. 1986)).  As explained in Plaintiffs' reply to Defendant's response to Motion for Leave to File Complaint Out of Time and to Vacate Dismissal Order and as acknowledged by Defendant, this Court has not adhered to the strict interpretation set by *Georgetown Steel Corp.*

20

*See* Pls. Reply to Def. Resp. to Mot. For Leave to File Comp. Out of Time, ECF No. 23 (Aug. 12, 2025).  Defendant-Intervenor's response does not present any relevant case or question that this Court did not already address in *Ban Me Thuot Honeybee JSC v. United States*, 805 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).  This Court correctly observed that "{t}he text of 19 U.S.C. § 1516a does not contain any explicit language construing the statute's time periods as jurisdictional."  *Ban Me Thuot Honeybee JSC*, 805 F. Supp. 3d at 1355-1356, citing *Arlanxeo USA LLC v. United States*, 337 F. Supp. 3d 1350, 1355 (Ct. Int'l Trade 2018); *and Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 106 F. Supp. 3d 1328, 1334 (Ct. Int'l Trade 2015) (explaining, "{t}here is simply no 'express jurisdictional language or language implying that {§ 1516a(a)(2)'s} timing requirements are jurisdictional.").  This Court correctly rejected Defendant's jurisdictional argument and Defendant-Intervenor essentially asks the Court to reconsider that decision "for the reasons previously explained by Defendant." Def. Int. Resp. Br., at 10.  As such, this Court should continue to find that it has subject matter jurisdiction in this matter.

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiffs and Plaintiff-Intervenors respectfully request that this Court grant their Motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the arguments provided above.

Respectfully submitted,

/s/ Jonathan M. Freed
Jonathan M. Freed
MacKensie R. Sugama
Didie Muller
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue SE, Suite 500
Washington, DC 20003

Date:  July 30, 2026                    *Counsel to Plaintiffs and Plaintiff-Intervenors*

21

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| BAN ME THUOT HONEYBEE JSC, ET. AL., )<br><br>*Plaintiffs*, )<br><br>and )<br><br>BAO NGUYEN HONEYBEE CO, LTD, ET. AL., )<br><br>*Plaintiff-Intervenors*, )<br><br>v. )<br><br>UNITED STATES, )<br><br>*Defendant*, )<br><br>and )<br><br>AMERICAN HONEY PRODUCERS ASSOC. )<br><br>*Defendant-Intervenor*. ) | Before: The Hon. Richard K. Eaton,<br>Senior Judge<br><br>Court No.  25-00085 |

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Reply Brief of Plaintiffs and Plaintiff Intervenors, dated July 30, 2026, complies with the word-count limitation described in the Scheduling Order.  The reply brief contains 6,361 words according to the word-count function of the word-processing software used to prepare the brief.

Respectfully submitted,

/s/ Jonathan M. Freed
Jonathan M. Freed
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue SE, Suite 500
Washington, DC  20003
(202) 223-3760

Date: July 30, 2026    *Counsel to Plaintiffs and Plaintiff-Intervenors*

22